IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WEIH STEVE CHANG[1],

        Plaintiff,

v.

THE UNITED STATES OF AMERICA;
CHRISTOPHER WRAY, Director of
Federal Bureau of Investigation, in his official
capacity; JOHN DEMERS, Assistant Attorney
General, National Security Division and "China
Initiative Working Group", U.S. Department of
Justice, in his official capacity; JOHN DOE(S) and
JANE DOE of "Squadron C", Federal Bureau of
Investigation; JOSEPH R. BIDEN, JR., President of
the United States in his official capacity,

        Defendants.

---

Case: 1:22–cv–00352
Assigned To : Walton, Reggie B.
Assign. Date : 1/28/2022
Description: Pro Se Gen. Civ. (F-DECK)

**Civil Action No. _____**

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

---

## INTRODUCTION

1.  Plaintiff [2] of Chinese heritage brings this action against the above-captioned defendants ("Defendants") to overturn *Korematsu v. United States*, 323 U.S. 214 (1944)[3] and to prevent the "China Initiative" from further damaging America's national security, threatening civil liberties, and depriving American residents and citizens of equal protection under law.

2.  In the wake of the Japanese attack on Pearl Harbor and the report of the First Roberts Commission, President Franklin D. Roosevelt issued Executive Order 9066 authorizing the

---

[1]  Plaintiff reserves his rights to amend this Complaint naming his former employer, a private company doing businesses in the District of Columbia, as co-defendant(s).

[2]  This action is in honor of Lee Yick and Wo Lee in *Yick Wo v. Hopkins,* 118 U.S. 356 (1886), two Chinese aliens whose rights, privileges, and immunities conferred by international laws are constitutionally protected.

[3]  The Court's decision in *Trump v. Hawaii*, No. 17-965, 585 U.S. (2018) does not constitute an actual overturning of *Korematsu* because Executive Order 9066 targeted domestic persons of Japanese ancestry while the executive order in *Trump* bans certain foreign travelers coming into the U.S. from foreign territories.  Thus, although the Chief Justice, in dicta, stated that *Korematsu* "was gravely wrong the day it was decided" and that it was "…overruled in the court of history," it remains the law of the land and has never been overturned in the Courts.

internment of about 120,000 Japanese Americans based on a governmental assertion that persons of Japanese ancestry had engaged in widespread espionage leading up to the attack and would continue to pose national security threats against the United States during the war.

3.  Seventy five (75) years after *Korematsu*, on November 1, 2018 and without a declared war or an actual war between the United States and China, then-Attorney General Jeff Sessions ("Sessions") launched the "China Initiative" based on a false governmental assertion that hundreds of thousands of citizens and residents having ancestral, academic, business, cultural, and diplomatic ties with China had aided and would continue to aid "China's Economic Aggression" against the United States, thus posing a national security threat. More disturbingly, the "China Initiative" embodied a repeat of a historic and illegally discriminatory stereotype that Americans of Chinese descent are an undesirable and disloyal race to this country. Among other things, Sessions ordered the FBI and the National Security Division ("NSD") of the Department of Justice ("DOJ") to assume responsibility "for countering nation state threats to the country's …private sector…identifying and prosecuting those engaged in trade secret theft, hacking and economic espionage…"[4] In sum, the "China Initiative" is a government sponsored program which institutionalizes discrimination based on race, falsely disguised as a national security program.

4.  On November 27, 2019, "Squadron C" of the Federal Bureau of Investigation ("FBI") conducted a predawn raid of Plaintiff's residence making him one of the many thousands of suspects discriminated against and illegally targeted under the "China Initiative".  The raid echoes the arrest of Fred Korematsu, on Memorial Day 1942 who was discriminated against based on his race and falsely targeted as a spy for the Empire of Japan.  In fact, Korematsu's only "crime" was his refusal to report to an internment camp for people of Japanese ancestry.

---

[4]  https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage

5.   In *Korematsu*, the Supreme Court applied a strict scrutiny standard of review to racial discrimination by the government. Plaintiff requests that the Court apply the same strict scrutiny standard and that it denounce and overrule the racist underpinnings of *Korematsu* as it declares the illegality of the "China Initiative."   Plaintiff seeks a declaratory judgment stating that the executive power may not be employed in a discriminatory fashion to deny or disparage rights and privileges as enumerated in the Constitution for all citizens regardless of their ethnic origins, including but not limited to the equal protection rights granted by the 5th and 14th Amendments.

6.   The Take Care Clause in Article II Section 3 is the primary source of the presidential power, and it seemingly invests in the Executive Branch the broadest national security authority. Yet, at the same time, this provision also serves as a major limitation on presidential power because it mandates that the executive faithfully execute the laws of Congress and the Constitution and not disregard them.

7.   The oath in Article II Section 1 to "faithfully" … and "to the best of my ability, preserve, protect and defend the Constitution of the United States" covers times of peace, and more importantly, times of war and other national security crises.

8.   From *Korematsu*, to McCarthyism, the Vietnam War, the War on Terror, and the present-day "China Initiative", too often the President and the Executive Branch have misused the Take Care Clause, arrogating to themselves unrestricted power and authority.  *Korematsu* and the case at bar both illustrate how the President and the Executive Branch have abused and stretched their power and authority by issuing unlawful executive orders, launching arbitrary and capricious agency initiatives of selective prosecution of minorities, and promulgating abusive rules, regulations and policies which are facially discriminatory.

9.   As described above, the President violated the Oath of Office as set forth in Article II Section 1, *i.e.,* by subverting instead of preserving, protecting, and defending the Laws and the

Constitution.

10. From the very beginning, the "China Initiative" is based on a false narrative. In his prepared remarks to the public, Sessions knowingly and willfully lied, stating that "from 2013 to 2016, the Department of Justice did not charge anyone with spying for China."[5]

11. In the same remarks, Sessions deceitfully proclaimed that the purpose of the "China Initiative Working Group" was "to charge wrongdoers based on carefully conducted investigations done with **integrity and professionalism**, not **politics**…" Session's statements were provably false. Indeed, the FBI did target citizens because of their Chinese ancestry and the three highest-profile espionage indictments were filed against Xi, Chen, and Cao-Li. None of these prosecutions were performed with professionalism or integrity and all three of these racially motivated prosecutions completely fell apart over a period of ten (10) months from 2014 to 2015.

12. To cover his old segregationist past and the new initiative's overt racial-profiling, Sessions recruited United States Attorney Alex Tse of the Northern District of California to the "China Initiative Working Group". Tse appeared to determine that he was being used as a figurehead and soon left.

13. In December 2019, about a year after Sessions' announcement, the Office of Inspector General released a report titled *"Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation."*[6] This report revealed rampant political bias, rather than integrity and professionalism, in the FBI's national security and counterintelligence operations. Thoroughly humiliated in public the FBI claimed to have implemented "more than 40 corrective steps" to address the report's recommendations.

---

[5] There are at least three high-profile criminal indictments of Chinese-American scientists for economic espionage from 2013 to 2016: Professor Xiaoxing Xi of Temple University; Sherry Chen, a hydrologist with the U.S. National Weather Service in Ohio; and Guoqing Cao and Shuyu Li, senior biologists at Eli Lilly & Company.
[6] https://www.fbi.gov/news/pressrel/press-releases/fbi-director-christopher-wray-response-to-inspector-general-report

14. Yet, none of the 40 corrective steps addressed the FBI's tradition of racial prejudice, the most corrosive form of political bias. Emblematic of this mindset, the FBI Headquarters in Washington D.C. remains the namesake of J. Edgar Hoover, who was a confirmed abuser of the law and of his office when he directed the FBI.  It is now known that Hoover formalized a covert "dirty tricks" program and used it against his enemies and to prosecute communists and homosexuals in the name of national security.

15. The Internment of Japanese Americans, J. Edgar Hoover's dirty tricks, NSA's warrantless surveillance, and now the "China Initiative" represent a steady continuum of chronic abuse of national security authority by the President and the Executive Branch.

## EVENTS LEADING TO THIS CIVIL ACTION

### *"The FBI's Say-one-thing-do-another Habit"*

16. The FBI has historically misused its powers by collecting information not only on possible domestic threats but also on perceived enemies such as Communists, anarchists, civil rights groups, and racial minorities. Although unreasonable searches and seizures are strictly prohibited in law enforcement, they are nonetheless wittingly encouraged in intelligence gathering. The FBI routinely asks the public to place blind trust in its mission "to uphold the Constitution of the United States". Yet, its decades-long practice of racial-profiling of persons including those of Chinese heritage exemplifies the historic and habitual abuse of its powers.

17. In general, America's criminal justice system is fundamentally flawed in the disparate way in which it dispenses justice to its citizens based on race.  It has marginalized politically disenfranchised communities of African and Hispanic Americans, and persons of Chinese heritage, who still bear the brunt of that injustice.[7]

---

[7] The DOJ looms large over the entire criminal-justice landscape by establishing norms, setting examples, providing oversight, and offering—or withholding—financial incentives to state and municipal agencies and jurisdictions.

18. Prior to the "China Initiative", administration after administration of both Democrat and Republican presidents systematically and impermissibly distorted existing laws, including but not limited to the Espionage Act (1917) and the Economic Espionage Act (1996), to conduct racially motivated witch-hunts against persons of Chinese heritage.[8] [9] This long-standing practice of racial profiling has been proven not only to be ineffective and unconstitutional, but to have irreversibly damaged the national security of the U.S.

19. A recent empirical analysis led by Andrew Chongseh Kim which predated the "China Initiative" established a statistical similarity between racial profiling against African American motorists on interstate highways and ethnic targeting against Asian Americans in economic espionage enforcement.[10]

20. With his early success in the 2016 presidential campaign, in part by calling Mexicans "Murderers" and "Rapists", Donald Trump unapologetically identified Chinese as "Rapists" of another kind. On May 2, 2016, as Indiana's primary of 2016 neared Trump announced to his supporters that "we can't continue to allow China to **rape** our country and that's what they're doing. It's **the greatest theft** in the history of the world."

21. Trump's campaign diatribes were incorporated into law enforcement policy.  For example, on July 7, 2020, and in support of Trump's 2020 re-election, Christopher Wray ("Wray"), the Director of the FBI, fanned the flames of racial hatred by repeating Trump's "Rapists" assertion, stating: "it's the people of the United States who are the victims of what

---

After 9/11, many state and local police agencies embraced the spying agency concept called intelligence-led policing (ILP). ILP focuses on the gathering and analysis of "intelligence" in the pursuit of proactive strategies "geared toward crime control and quality of life issues". This new theory of criminal intelligence argues that collecting even outwardly innocuous behaviors will somehow enhance security. Black and Brown people are disproportionally subject to this new breed of police misconduct.

[8] See Hsue-Shen Tsien and eighty others in *the China cloud: America's Tragic Blunder and China's Rise to Nuclear Power* by William L. Ryan, January 1, 1968

[9] See Harry Sheng (1973); Chang-Lin Tien (1980's); Wen Ho Lee (1999) in *the FBI's China Obsession* by Mara Hvistendahl, February 2, 2020. https://theintercept.com/2020/02/02/fbi-chinese-scientists-surveillance/

[10] https://www.committee100.org/wp-content/uploads/2017/05/2017-Kim-White-Paper-online.pdf

amounts to Chinese theft on a scale so massive that it represents one of the largest transfers of wealth in human history.[11]

22. Indeed, while advancing its disinformation campaign, the FBI had borrowed a wartime slogan from J. Edgar Hoover, i.e., "the war against spies and saboteurs demands the aid of every American."  On February 13, 2018, Wray told the Senate Intelligence Committee that China had sent its spies as "Nontraditional Collectors", *i.e.,* non-spies can be suspected to be spies simply because of their ancestry or any other links they may have to China. The bureau is to "view the China threat as not just a whole of government threat but a whole of society threat on their end, and… it's going to take a whole of society response by us. It's not just the intelligence community, but it's raising awareness within our academic sector, within our private sector as part of the defense."[12]

23. The "Whole-of-Society Response" is a set of abusive rules, regulations and policies promulgated by the "China Initiative Working Group" to entice, encourage, or compel government employers[13] and private sector employers, including academics, to form a surveillance society. This opens the door to unfettered and uncontrolled spying on persons of Chinese heritage and confers on those persons doing so the aura of protecting national security. Like COINTELPRO, the "China Initiative" uses university administrators[14] and other private employers as informants and assets acting as the eyes and ears of the FBI looking for "nontraditional collectors".

### *"Coordination and Oversight in Washington"*

24. "The United States Attorneys' Offices are required to consult with the Criminal

---

[11] https://www.fbi.gov/news/speeches/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states
[12] Christopher Wray, *"Global Threats and National Security"*, C-Span, February 13, 2018, https://www.c-span.org/video/?440888-1/fbi-director-rob-porter-background-check-completed-july
[13] See Commerce Department spying on its own employees. https://www.washingtonpost.com/investigations/2021/05/24/commerce-department-monitoring-itms/
[14] https://www.courthousenews.com/fbi-seeks-universities-help-against-chinese-research-theft/

Division [in Washington D.C.] with respect to any national security issue…The term 'national security issue' is meant to be a broad one, encompassing any issue relating to 'the national defense, foreign intelligence or foreign counterintelligence, internal security, and foreign relations.'" [15]

25. In 2016, then-Deputy Attorney General Sally Yates issued a letter advising the United States Attorneys' Offices "that all cases affecting national security, **even tangentially**, require coordination and oversight in Washington [D.C.]."[16]

26. The raid at Plaintiff's residence and subsequent FBI fishing expeditions are supervised and coordinated by the "China Initiative Working Group" in Washington D.C. because Plaintiff's extensive access to healthcare data is of great interest to the group.

27. On July 7, 2020, Wray publicly stated "…If you are an American adult, it is more likely than not that China has stolen your personal data…Our data isn't the only thing at stake here—so are our health, our livelihoods, and our security. …over the past decade, we've seen economic espionage cases with a link to China increase by approximately 1,300 percent."[17]

28. In February 2021, the National Counterintelligence and Security Center ("NCSC") of Office of the Director of National Intelligence ("DNI") issued a report[18] warning that "China's access to U.S. healthcare and genomic data poses serious privacy and national security risks to the U.S." The DNI's former Director Bill Evanina went on "CBS 60 Minutes" and Washington Post alleging the likelihood to be "110 percent", that "80% of American adults have had all of their personally identifiable information stolen by the Communist Party of China".

---

[15] *See* Jamie S. Gorelick. September 21, 1994, Memorandum from Deputy Atty General Concerning Requirement of Consultation on National Security Issues.
https://www.justice.gov/archives/jm/criminal-resource-manual-2049-september-21-1994-memorandum-deputy-atty-general-concerning
[16] https://www.nytimes.com/2016/04/27/us/after-missteps-us-tightens-rules-for-national-security-cases.html
[17] Ibid. 11.
[18] http://nuari.net/wp-content/uploads/2021/05/NCSC_China_Genomics_Fact_Sheet_2021.pdf

29. The official rhetoric by the FBI and NCSC resembles that of Joe McCarthy with his fake lists of communists and J. Edgar Hoover's old bag of dirty tricks.[19]

30. Using the seemingly shocking statistics of purported national security threats, unverifiable because of a spy agency's secrecy, Director Wray targeted two audiences. To the mainstream media and the public, he intimates that national security is under attack by "the whole of Chinese society" to the extent that American people must put a blind trust in the President and the Executive Branch.  To all 56 of the FBI field offices, Wray's message is that the productivity goal of the "China Initiative" is expected to be measured by "a new … case about every 10 hours", half of "5,000 active …cases", to be increased at "1,300 percent".[20]

### *"Whole-of-Society Response" –*
### *A Surveillance Society Over Racial Minorities*

31. To achieve the lofty numbers set forth by Wray, John Demers ("Demers") of the NSD, the head of the "China Initiative Working Group", devised an approach that far exceeded what the Constitution or Congress authorized. Demers has sought a public-private partnership to create an even more extensive surveillance society.

32. Demers testified in the Senate on December 12, 2018 that "…even a whole-of-Executive-Branch effort will not succeed alone…we must work together with you in the Congress, as well as with **the private secto**r, **academic institutions**, and foreign partners." "Our **private sector** finds itself the target of one of the most well-resourced nation-states in history and tactics that go far beyond the normal rough and tumble of capitalism. American businesses need the backing of the U.S. government to survive this threat".[21] Like Wray, Demers needs "a whole of society response", i.e., collaborations from private employers as investigators and informants.

---

[19] Ibid. 12.
[20] See alleged productivity goals in *U.S. Attorney in L.A. Set Quotas, Staff Says,*
https://www.latimes.com/archives/la-xpm-2008-apr-18-me-quota18-story.html
[21] https://www.judiciary.senate.gov/imo/media/doc/12-12-18%20Demers%20Testimony.pdf

33. On November 27, 2019, the FBI conducted a predawn raid of Plaintiff's residence on behalf of a private sector employer after the private employer ("PE") fabricated a claim of hacking government computers and a claim of disclosing protected health information ("PHI") by Plaintiff. The FBI, without further investigation, used the PE's false, uninvestigated claims as probable cause for the search warrant.  By August 7, 2020, after the FBI had obviously failed to gather sufficient evidence from over 125 electronic devices seized in the raid, it sought another search warrant for Plaintiff's Google account. But for his Chinese ancestry, the FBI would never have issued the search warrant, nor would it have sought additional evidence against Plaintiff without first investigating the false allegations made by a private company.

34. Plaintiff was employed by the PE, a health insurance company with offices in Pennsylvania and the District of Columbia. Plaintiff worked onsite at the PE's office in the first half of 2010 and, six years later, worked remotely at his residence in Delaware from November 2016 to November 2019.

35. In August 2019, the PE went through a major IT upgrade when many laptops and desktop computers running on Windows 7 were to be replaced with new ones running on Windows 10. Plaintiff was among a small group of employees who were issued new laptops described in company emails as "Windows 10 Pilot". "Pilot" meant that these new laptops were to be tested to assure that they were compliant with the security standards as the older company laptops.

36. Plaintiff soon found out that the new "Windows 10 Pilot", an HP Elitebook 840 G6 ("Elitebook"), was not as secured as the older laptop. Specifically, while all the USB ports of his old laptop were secured, none of them on the new Elitebook were secured. For example, the Elitebook has a "USB 3.1 Type-C port (with Thunderbolt support)", from which a separate operating system could be installed and run.

10

37. Plaintiff decided to experiment with the "USB 3.1 Type-C port (with Thunderbolt support)" by running a separate operating system for personal use.  When this use was detected by the PE's IT Security Department on or about November 5th, 2019, the Human Resources ("HR") and IT Security Departments ("IT Security") contacted Plaintiff via telephone. Plaintiff readily admitted that he had used the computer for personal matters with the separate operating system he had installed on the new laptop and was ready to accept applicable consequences, including termination. Plaintiff had no reason to lie about what he had done because he had not compromised company data in any way.

38. On or about November 6th, 2019, HR contacted Plaintiff via telephone instructing him to return all the company equipment, which he readily agreed to do on November 8th.  Unusually, HR also asked Plaintiff to bring in his own external drive(s) when returning the company equipment.

39. On or about November 8th, 2019, Plaintiff returned the PE's equipment, including both the old and the new laptops, to Chad Peterson, the PE's Chief Security Officer, at the front desk of the company headquarter. Peterson did not ask for any of Plaintiff's personal belongings.

40. Between November 8th and November 15th, HR contacted Plaintiff and demanded that he surrender his own external drive(s) to the company. Plaintiff refused. He had committed no crime and the PE is not a law enforcement agency. However, Plaintiff offered to come to the company headquarters in person to sign an affidavit attesting that no disclosure of PHI had ever occurred.

41. In the early evening hours of November 15th, 2019, while meeting a friend at a Delaware bar, Plaintiff received a phone call from a number with 412 area code. The PE's company phone numbers have 215 area code. The male caller used one of Plaintiff's other phone numbers ("###-###-9992") instead of the phone number he registered with the PE ("###-###-

6588") so the caller had apparently collected intelligence on Plaintiff. The caller demanded that Plaintiff surrender his external drive(s).  Plaintiff hung up.  The call came again, and this time Plaintiff promised to call back later in the evening when he returned to his residence.  When Plaintiff did in fact call back later that evening the man identified himself as someone from a law enforcement agency from Pittsburg, Pennsylvania and once again, demanded that Plaintiff return his personal drive(s) to the PE. Plaintiff suspected that he was being lied to and that the caller was merely pretending to be a law enforcement officer.

42. By then and in three separate occurrences, the PE answered the call of the "China Initiative Working Group" and conducted a "Whole-of-Society Response" to Plaintiff's workplace infraction. Without legal authority the PE made multiple attempts to seize Plaintiff's personal property without any evidence that he had committed an offense.

43. At all relevant times, the PE knew that Plaintiff was one of its employees under a general term called "Business Associate Agreement" that explicitly authorized Plaintiff's access to PHI.  The PE knew that Plaintiff did not need to modify any computer to access PHI.

44. The PE also knew that all of its employees are covered by HIPAA laws which prohibit them from disclosing PHI **during and after** their employment. Plaintiff's offer to sign an affidavit declaring no disclosure had ever occurred did not satisfy the PE. Instead, because of the incessant drumbeat of racially motivated claims made by then-President Trump and Defendants, the PE used Plaintiff's ethnicity and national origin against him to classify him as a Chinese "nontraditional collector" of healthcare data in the United States and to assume he had committed a crime.  In furtherance of its baseless charges, the PE enlisted the aid of the FBI which unquestioningly provided assistance in the form of its unjustified search and seizure of Plaintiff's properties which it retains to this day.

45. The PE and the FBI knowingly and willfully lied in support of the search warrant

stating that: "as part of [Plaintiff's] duties, [Plaintiff] was responsible for using a laptop computer …and transmitting relevant data to various state regulatory agencies nationwide…" PE and the FBI intentionally made the false statement to establish probable cause and yet Plaintiff never had access to any government agency computer systems and had never needed to modify any computer to gain access to "relevant data".

46. The PE and the FBI knowingly and willfully lied that "…security personnel knew that [Plaintiff's] statement was false because the laptop does not have a Thunderbolt or USB-C connection". The laptop identified as "a brand new HP Elitebook 840 G6" does have a "USB 3.1 Type-C port (with Thunderbolt support)" according to its manufacturer's website.[22] The PE and the FBI intentionally made the false statements to establish probable cause that Plaintiff lied during its investigation.

47. The PE and the FBI knowingly and willfully lied that, on or about November 8th, 2019, "[Plaintiff]… was trying to get into his office. As a telework employee, [Plaintiff] does not have an office in the building." In fact, Plaintiff and other tele-workers do have an office area which they routinely use when coming into the office. Plaintiff had no intention to enter the building on that day and did not even bring his ID badge. The PE and the FBI intentionally made the false statements to establish probable cause that Plaintiff attempted to breach the building's security.

48. Since the predawn raid of his residence, Plaintiff had refrained from contacting his former co-workers at the PE for fear that the FBI may charge him for witness tampering. However, some of them reached out to Plaintiff many months later and Plaintiff has learned that the PE has been conducting secret surveillance over all of its teleworkers without their knowledge. Defendants' "Whole-of-Society Response" has created a surveillance society where no one is safe.

---

[22] https://support.hp.com/us-en/document/c06352019#AbT7

*A Spy's Traps*

49. From J. Edgar Hoover's FBI to Wray's, the bureau's racially and politically motivated investigations often result in process crimes, void of an actual crime or criminal intent.

50. Plaintiff requested a copy of the first search warrant immediately after the raid. The FBI refused, repeatedly requesting that Plaintiff be interviewed by its agents. The FBI knew that, in a national security investigation, a target like Plaintiff was not allowed to know what the questioning by the FBI was all about – a perfect trap for perjury and other process crimes.

51. In October 2020 and nearly a year after the predawn raid, Plaintiff learned that the bureau sought a second search warrant for his Google account. Plaintiff again demanded a copy of the first search warrant and the government agreed this time. Plaintiff immediately identified the three demonstrably false statements cited above that have fraudulently established probable cause.

52. Over many months to the present day, Plaintiff has seen a series of persistent email messages from a hacker group inviting him to attend its events online or in person. These are likely phishing attacks from the FBI, or its intelligence assets. Connecting Plaintiff to any hacker group could bring much needed "evidence" for an otherwise fruitless investigation.

## PARTIES

53. Plaintiff was at all relevant times mentioned herein a naturalized United States citizen of Chinese Ancestry. Plaintiff is a "person" within the meaning of 5 U.S. Code § 551(2) who suffered from a "sanction" withing the meaning of 5 U.S. Code § 551(10).

54. Defendant United States of America ("USA") is the appropriate defendant under the constitutional claims in the context of presidential war powers, national security authority, civil liberties, and equal protection, and under the Administrative Procedure Act ("APA").

55. Defendant Wray is the Director of the FBI. The FBI is a component of the DOJ. Defendant Wray has authority over the "China Initiative Working Group" including but not

limited to the FBI's searches, seizures, and retention of private communications, data, papers, and property. He is sued in his official capacity.

56. Defendant Demers is the assistant Attorney General of the United States, the head of the NSD of the DOJ, and the head the "China Initiative Working Group". He has authority over the DOJ's searches, seizures, and retention of private communications, data, papers, and property. He is sued in his official capacity.

57. Agency Defendants FBI and DOJ are Executive departments under 5 U.S.C. § 101 and each is an "agency" within the meaning of 5 U.S.C. § 701. The "China Initiative" is an "agency action" withing the meaning of 5 U.S. Code § 551 and 5 U.S. Code § 704.

58. Defendant Joseph R. Biden, Jr. ("President Biden") is the Commander in Chief of the United States. President Biden inherited, approved of, and continued President Trump's "China Initiative". The Commander in Chief has authority over all national security matters, including but not limited to, the "China Initiative".  The national security and counterintelligence authority of the FBI and the NSD of the DOJ flows from the Commander in Chief. President Biden is sued in his official capacity.

59. Defendant(s) John and Jane Doe(s) were at all times relevant to this Complaint federal law enforcement agents, supervisors, and other officials who participated in the "China Initiative" and the investigation of Plaintiff by, among other things, signing applications and affidavits for search and seizure warrants or orders, and by possessing and controlling any data and information, or copies of such data and information, seized from Plaintiff.

## JURISDICTION AND VENUE

60. This action arises under the Fourth, Fifth, and Fourteenth Amendments, 5 U.S.C. §§ 553, 701–06. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

61. This Court has authority to issue declaratory relief, injunctive relief, and other relief

pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and 5 U.S.C. §§ 702, 704–706.

62. This is a civil action in which Defendants Wray, Demers, the FBI, and NSD are agencies of the United States or officers of such agencies. The agency actions that Defendants Wray, Demers, the FBI, and NSD are responsible for are generally not considered to be military and foreign affairs functions. The targets of the "China Initiative" are primarily domestic and non-military.

63. Venue is proper in this Court because the defendants command the "China Initiative" operations from within this district, and a substantial part of the "China Initiative" events giving rise to this action occurred in this district. The "China Initiative Working Group" operates in the FBI and DOJ's principal offices in this judicial district.

## LEGAL FRAMEWORK

### *Unrestricted Powers Must Be Limited*

64. *Korematsu* has never been overturned and it confers unrestricted war powers on the government under color of national security.

65. Warrantless electronic surveillance is the second most dangerously unrestricted war power of the President and the Executive Branch. Wiretapping, bugging, and break-ins were the holy trinity of J. Edgar Hoover's secretive intelligence operations since the 1930's. In 1978, FISA electronic surveillance replaced wiretapping. After the September 11 attacks, the President's authority to conduct warrantless electronic surveillance was further expanded according to John Yoo ("Yoo"), one of the government's leading attorneys. See the *Surveillance Memos* by the DOJ's Office of Legal Counsel [23] [24]. Yoo was the principal theorist of the Bush Administration's

---

[23] https://www.justice.gov/sites/default/files/olc/legacy/2009/08/24/memoforeignsurveillanceact09252001.pdf
[24] https://www.justice.gov/sites/default/files/pages/attachments/2014/09/19/may_6_2004_goldsmith_opinion.pdf

War on Terrorism policies.

66. The "China Initiative" as a national security program designates an entire ethnic group as suspected agents of China. Overnight, many thousands of individuals belonging to the targeted ethnic group became subjects of counterintelligence measures including FISA surveillance.

67. Yoo asserted the most open-ended interpretation of unrestricted war powers in his official memorandum titled "*Authority for Use of Military Force to Combat Terrorist Activities Within the United States*". [25]

68. As the author of the "Torture Memo" and the above-mentioned "Surveillance Memo", Yoo turned "to the question whether the Fourth Amendment would apply to <u>the use of the military domestically against foreign terrorists</u>". He concluded: "the Fourth Amendment would not apply in these circumstances. Thus, for example, we do not think that a military commander carrying out a raid on a terrorist cell would be required to demonstrate probable cause or to obtain a warrant".

69. Yoo further concluded that "the courts would not generally require a warrant, at least when the action was authorized by the President or other high executive branch official. The Government's compelling interest in protecting the nation from attack and in prosecuting the war effort would outweigh the relevant privacy interests, making the search or seizure reasonable".

70. Yoo's theory relies on *Korematsu* which held that President Franklin D. Roosevelt was legally authorized, without probable cause, to use the military domestically to mass-incarcerate purported enemy spies and combatants in the name of protecting the nation from attack and in prosecuting the war effort.

71. This holding is antithetical to the federalist constitution adopted by our Founders, that places limits on the powers of Congress, the judiciary and the Executive. Despite these limits, the public often learned, long after a real threat or a fabrication of threat had occurred, that the

---

[25] https://www.justice.gov/sites/default/files/olc/legacy/2009/08/24/memomilitaryforcecombatus10232001.pdf

presidential war powers were exercised with profoundly insufficient predicates of fact or legality.

72. The President and the Executive Branch must be prohibited from subverting the Constitution to justify the use of the national security authority against its own citizens. Tragically, history and the "China Initiative" have shown that this is seldom the case.

### *Strict Scrutiny under the Familiar Tripartite Scheme*

73. This civil action challenges the legality and the duration of the "China Initiative".

74. The "China Initiative" is racially predicated and therefore requires judicial review under the strict scrutiny standard adopted in *Korematsu*.

75. The "China Initiative" is worse than *Korematsu* in that Congress enacted Public Law 503, a much-needed rubber stamp for the executive branch after only an hour of discussion in the Senate and thirty minutes in the House.

76. Because the "China Initiative" is an act by the President and the Executive Branch which invokes national security authority to intervene in employment matters, and other industrial, commercial, academic affairs of domestic persons, it requires judicial review under the "Familiar Tripartite Scheme". See *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) establishing judicial review under "the accepted framework for evaluating executive action" intervening in industrial affairs during wartime.

77. Moreover, the "China Initiative" is far vaguer and more expansive than *Youngstown* as, in the latter case, the President Truman sought to control the production of steel. In contrast, the "China Initiative Working Group", during a time of peace, seeks to monitor and possibly prosecute every possible exchange of goods, services, and even academic and scientific ideas involving any Chinese person or any person with Chinese contact. The expansiveness of the powers granted to the "China Initiative Working Group" is unprecedented and is without Congressional authorization.

### *A Government of Laws, Not Men*

78.   "The government of the United States has been emphatically termed a government of laws, and not of men". *Marbury v. Madison*, 5 U.S. 137 (1803).  *Marbury* established judicial review as the legal power of a court to determine if a statute, a bilateral agreement, or administrative regulation contradicts or violates the provisions of existing law, a State Constitution, or ultimately the Constitution.

79.   Through the "China Initiative" Defendants Wray and Demers, two unelected bureaucrats, have made every single exchange between China and citizens of the U.S. a suspicious transaction subject to the Economic Espionage Act and the Espionage Act.

80.   Overnight and without the due process of notice-and-comment rulemaking Defendants designated protected commercial information and business records, including but not limited to PHI records, as classified, national defense information.

### *Korematsu: Plessy for Asian Americans*

81.   *Plessy v. Ferguson*, 163 U.S. 537 (1896) established the "Separate but Equal" doctrine targeting African Americans. *Korematsu* established the "Separate but Equal" doctrine targeting Asian Americans under color of national security.

82.   As in *Plessy*, Fred Korematsu was also a naturally born U.S. citizen subjected to racial discrimination by Executive Order 9066.

83.   Among persons in the U.S. whose origins were from one of the three Axis Powers, 1.2 million persons had been born in Germany, 5 million had two native-German parents, and 6 million had one native-German parent. About 11,000 ethnic Germans, overwhelmingly German nationals, were detained. About 1,881 out of 695,000 Italian Americans were detained. On that basis, Korematsu argued that Executive Order 9066 violated the Equal Protection Clause of the 14th Amendment because it unfairly targeted persons of Japanese ancestry.

84.   Nonetheless, the *Korematsu* court impliedly overturned *Yick Wo* holding that the Equal Protection Clause of the 14th Amendment was not meant to protect domestic persons of Japanese ancestry during a war with Japan.

### ALLEGATIONS SPECIFIC TO PLAINTIFF'S CONSTITUTIONAL CLAIMS

#### *Defendants Have No Authority to Declare an Economic Espionage War*

85.   Plaintiff incorporates the allegations above as if fully made herein.

86.   The Constitution grants Congress the sole power to declare war and to then employ war powers domestically.

87.   Here, Congress has not enacted a "Chinese Economic Aggression Act" authorizing the "China Initiative" as a national security program and yet Defendants Wray and Demers have assumed war powers without authority to do so and have illegally and unconstitutionally targeted domestic persons of Chinese ancestry.

#### *Defendants' Purported War Powers Have Domestic Limits*

88.   Plaintiff incorporates the allegations above as if fully made herein.

89.   Warrantless surveillance and use of military force within the United States on domestic persons contradicts *Youngstown*.

90.   Under the Tripartite Scheme, the *Youngstown* court first found no statutory authority for the Commander in Chief to seize the nation's steel mills for military needs. The court then found it "obvious from the Constitution and from elementary American history" that, under the Third Amendment, "even in war time, his [Commander in Chief's] seizure of needed military housing must be authorized by Congress."

91.   The *Youngstown* court held that "such a limitation on the command power… underscores the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy". War powers, when exercised domestically

to effectuate suspension of constitutionally protected rights and privileges, may only come from Congress. Here, Congress has been silent.

92.   The *Youngstown* court further held that "…it also was expressly left to Congress to 'provide for calling forth the Militia [private entities] to execute the Laws of the Union, suppress Insurrections and repel Invasions [of a nation-state]'…" Defendants' "Whole-of-Society Response" – a private-government partnership in counterintelligence authority – is without Congressional authorization to call forth participation by private employers on spying or law enforcement.

93.   In 2013, Edward Snowden disclosed that private companies including Microsoft, Yahoo, Google, Facebook, PalTalk, YouTube, Skype, AOL, and Apple cooperated with the NSA's PRISM surveillance program.

94.   Here, Defendants Wray and Demers fraudulently convinced private sector employers, such as Plaintiff's former employer, and even academic institutions, that the government's war powers and authorities were so without constitutional limits that domestic targets of the "China Initiative" were no longer afforded all of their rights and privileges under the Constitution.

95.   Plaintiff's predicament resembles those of other persons subjected to fraudulent national security investigations. Throughout the FBI's history it has continued to make up and prosecute process crimes when there is no underlying crime or even criminal intent.

96.   In a proceeding involving a traditional crime, the FBI is a law enforcement agency required to follow the due course of law under which the burden of proof of guilt is on the government. In counterintelligence operations, the FBI acts as a spy agency and the burden of proof of innocence is on the suspects. The FBI was a spy agency when its agents interviewed Fred Korematsu in 1942 and remained a spy agency when Defendant Does raided Plaintiff's residence.

97.   The suspects are often forced or tricked to provide the spy agency with evidence that

they are not "disloyal" or "un-American."

98.   Defendants Wray and Demers employed other abusive tactics. They include (a) stacking charges and invoking mandatory minimums in order to increase a defendant's  exposure to a lengthy prison sentence; (b) threatening defendants with a massive trial penalty; (c) threatening to indict a defendant's friends or family members; (d) giving "exploding" plea offers that are automatically withdrawn if the defendant exercises certain rights or takes too long to decide; and (e) withholding evidence favorable to the defense during plea negotiations knowing that it will have to be produced if the case goes to trial.

99.   Relying on *Korematsu* and Yoo's theories of unlimited war powers Defendants Wray and Demers have knowingly and willfully disregarded the domestic limits placed on the President and the Executive Branch by the Constitution.

### *Korematsu "Validated the Principle of Racial Discrimination"*

100.   Plaintiff incorporates the allegations above as if fully made herein.

101.   Defendants' theory of "a whole of society threat" is not only a xenophobic fantasy but is also used to promote its long-standing practice of racially predicated investigations and prosecutions. The "China Initiative" is largely a continuation and expansion of J. Edgar Hoover's "Chinese Scientist Program"[26] on Asian Americans, as the spy agency's tactic of lodging "disloyalty" or "being un-American" claims against a politically disenfranchised and legally naïve group has been grotesquely effective.

102.   The tactic is traceable to *Korematsu*. There, Justice Robert H. Jackson predicted Defendants' racial profiling. Once and for all time, Justice Jackson wrote, the *Korematsu* court "has validated the principle of racial discrimination in criminal procedure and of transplanting

---

[26] Ibid. 9. According to a 1975 document listing all domestic FBI counterintelligence programs, the "Chinese Scientist Program" was focused on recruiting ethnic Chinese scientists to spy on other Chinese scientists.

American citizens…The principle then lies about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need".

103. Defendants no longer limit the "China Initiative" practice of racial profiling in science and academia. Now, every activity is conceivably linked to China commercially, culturally, or academically, or otherwise, and is subject to sweeping investigations and prosecutions.

104. Plaintiff is not a scientist. Yet Defendants' "Whole-of-Society Response", a dog whistle in essence, has sufficiently enabled a vigilante-like reaction from Plaintiff's private employer to such an extent that its security personnel knowingly and willfully impersonated law enforcement agents as they attempted to seize Plaintiff's personal property, and then composed perjurious "facts" for the FBI, so that it could do what it could not.

105. As a direct and proximate result of Defendants' decades-long practice of racial profiling since *Korematsu*, all of which predate the "China Initiative", Plaintiff suffered substantial damages, including loss of liberty, invasion of privacy, substantial emotional distress and harm, loss of reputation, and physical harms caused by the emotional distress, including difficulty sleeping, nightmares, difficulty focusing on daily tasks, and changed behavior in work practices. In addition, Plaintiff has suffered substantial economic damage, including loss of income and loss of future earnings, and costs and expenses of coping with Defendants' ongoing unlawful conduct.

106. For his actual, ongoing, and threatened injuries traceable to *Korematsu* and the "China Initiative", Plaintiff requests that the Court overturn *Korematsu* and declare the "China Initiative" to be unconstitutional.

### *Subversion of Laws and the Constitution by Commander-in-Chief*

107. Plaintiff incorporates the allegations above as if fully made herein.

108. Justice Robert Jackson warned of the danger to America if it permitted its civil courts

to become instruments of an out-of-control national security apparatus.

109. Dissenting in *Korematsu*, Justice Jackson wrote "I should hold that a civil court cannot be made to enforce an order which violates constitutional limitations even if it is a reasonable exercise of military authority. The courts can exercise only the judicial power, can apply only law, and must abide by the Constitution, or they cease to be civil courts and become instruments of military policy".

110. Defendants Wray and Demers belong to the present-day administrative state of national security – a collection of unelected federal bureaucrats, including but not limited to Agency Defendants FBI and NSD – the ruling oligarchy at the highest level of the Executive Branch. Like J. Edgar Hoover, Defendants use real and imagined existential threats from any conceivable foreign state to enable them to assume unrestricted executive powers and bypass judicial review.

111. In 1940, then-Attorney General Robert Jackson had ordered a halt to the FBI wiretapping after the Supreme Court in *Nardone v. United States*, 308 U.S. 338 (1939) made clear that the Communications Act of 1934 prohibited it. President Franklin Roosevelt secretly ordered Jackson to reverse his decision and to authorize wiretaps. The President invoked judicial deference by saying "I am convinced that the Supreme Court never intended any dictum ... to apply to grave matters involving the defense of the nation". As AG Jackson personally witnessed the president subverting an existing law and the Constitution, it came as no surprise that Justice Jackson dissented in *Korematsu*.

112. In an earlier wiretapping case, *Olmstead v. United States,* 277 U.S. 438 (1928), Justice Louis Brandeis, dissenting, offered a far more dire prediction: "Crime is contagious. If the government becomes a law-breaker, it breeds contempt for the law; it invites every man to become a law unto himself; it invites anarchy".

113. In *Korematsu*, the government without evidence designated an entire racial minority

group as a national security threat on behalf of an enemy nation-state during an actual war. In this instant action, Defendants without evidence indicted Chinese Americans for aiding and abetting China's economic rise and aggression during time of peace.

114. As the government did in *Korematsu*, Defendants knowingly, willfully, and deliberately devised and executed a racially predicated national security program of selective prosecution by designating an entire ethnic group as "fraudsters", "spies", "traitors", or "thieves". Defendants Wray and Demers did so in support of Donald Trump's 2020 re-election campaign and projected 2024 presidential campaign.

115. Plaintiff has never broken any law. To the contrary, Defendants are the law-breakers. Accordingly, the Court must, without restraint or deference, reverse its holding in *Korematsu* and declare the "China Initiative" unconstitutional.

## ALLEGATIONS SPECIFIC TO PLAINTIFF'S APA CLAIMS

### *Unprecedented Authorities of the "China Initiative"*

116. Plaintiff incorporates the allegations above as if fully made herein.

117. Between 2017 and 2021, the Trump Administration issued fifteen (15) executive orders that involved the U.S.-China relationship. In addition to these 15 executive orders, one hundred sixteen (116) China-related measures were taken by the White House and other executive departments. The majority of these measures targeted foreign entities and foreigners in subject areas of defense and military implications.[27]

118. On April 29, 2017, Executive Order 13797 established the Office of Trade and Manufacturing Policy ("OTMP"). In June 2018, the OTMP published a report "How China's Economic Aggression Threatens the Technologies and Intellectual Property of the United States

---

[27] https://www.uscc.gov/sites/default/files/2021-04/Timeline_of_Executive_Actions_on_China-2017_to_2021.pdf

and the World".[28] The report alleged Chinese "hacking into American businesses and commercial networks".

119. In November 2018, Sessions cited the OTMP Report as the "smoking gun" for the "China Initiative".[29] On June 14, 2021, Defendants Demers and NSD cited the same report[30] to justify the initiative as a national security program prioritized and expedited on a specific color, race, ethnicity, and national origin.

120. One month following Sessions' announcement, on December 12, 2018, Defendant Demers presented to the Senate his prepared testimony, "China's Non-Traditional Espionage Against the United States".[31] Demers chose his words cleverly and purposefully – "Espionage Against the United States" means a treasonous crime that entitles him, the head of the "China Initiative Working Group", to assume unprecedented authority.

121. Demers' domestic targets now also include persons involved in "Joint Ventures" ("JV"), "S&T (Science and Technology) Investments", "M&A (Mergers and Acquisitions)", and "Front Companies", *i.e.*, investment and financial transactions traditionally regulated by other existing federal authorities.

122. According to Demers, a domestic person's connections to open-market "Talent Recruitment Programs", namely China's "Thousand Talent Program", automatically triggers an espionage investigation.

123. Under its unprecedented authority the "China Initiative Working Group" is purportedly authorized (a) to practice ethnicity-based selective prosecution; (b) to investigate non-espionage cases as espionage cases; (c) to search and seize persons and properties without sufficient predication and probable cause; (d) to recruit public and private employers as counterintelligence

---

[28] https://www.hsdl.org/?view&did=812268
[29] Ibid. 4.
[30] https://www.justice.gov/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related
[31] Ibid. 21.

informants through enticement, encouragement, or orders; and (e) to use FISA for domestic collection of intelligence on Chinese persons.

124. Under its unprecedented authority the "China Initiative Working Group" adopted a pronounced policy of selective prosecution of Chinese persons under existing authorities of False Claims Act, Foreign Corrupt Practices Act, Foreign Agent Registration Act, Foreign Investment Risk Review Modernization Act, export control laws, and even under the NIH and DOD grant rules, university ethics rules, and conflicts of interest policy – all in support of Donald Trump's economic "Rapist" claim.

### *Unprecedented Jurisdiction of the "China Initiative"*

125. Plaintiff incorporates the allegations above as if fully made herein.

126. HIPAA laws and rules are traditionally enforced by the U.S. Department of Health and Human Services ("HHS"). HIPAA violations are first investigated by the HHS, and the HHS makes criminal referrals under existing laws. Under the "China Initiative", Defendants assumed jurisdiction of the HHS, escalated patient privacy risks into a matter of national security threats and made Plaintiff an economic espionage suspect without any evidence that Plaintiff had ever violated HIPAA to begin with.

127. Each year, over 300,000 students from China attend American universities and colleges. Their enrollment has been welcomed by college administrations for academic and financial reasons. Defendant Wray testified that "the use of nontraditional collectors, especially in the academic setting, whether it's professors, scientists, students, we see in almost every field office that the FBI has around the country. It's not just in major cities. It's in small ones as well. It's across basically every discipline".

128. Without alleging a single spy-training program in China that could have produced 300,000 economic spies each year, Wray expanded his jurisdiction to entice, encourage, and

compel college administrations to domestically surveille and monitor 300,000 domestic targets.

### *Unfettered Abuse of Discretion by the "China Initiative Working Group"*

129. Plaintiff incorporates the allegations above as if fully made herein.

130. In an undeclared economic espionage war with China, the "China Initiative" weaponized Defendants themselves with absolute discretionary power under national security authority and absolute prosecutorial immunity. With absolute power comes absolute abuse.

131. Defendants' race threat theory is deliberate disinformation that is rarely questioned. Their authority to re-interpret existing federal laws, bilateral treaties, and the Constitution is never challenged.

132. PHI, intellectual properties, commercial trade secrets, scientific research data, and other technological innovations, no matter how compromised, cannot be legally construed as classified or national defense information without first undergoing the legislative or rulemaking processes. Defendants abusively re-interpreted PHI and other protected commercial information as national defense information.[32] [33]

133. Bilateral treaties like the Shanghai Communiqué and other Sino-US agreements have affirmatively conferred rights, privileges, or immunities to domestic entities and persons to have lawful ties with China. As upheld in *Yick Wo*, rights, privileges, and immunities under the Burlingame-Seward Treaty of 1868 are constitutionally protected.   Nonetheless, Defendants effectively rescinded bilateral agreements and suspended constitutionally protected rights, privileges, and immunities guaranteed under them.

134. This seismic shift caused by the "China Initiative" has affected hundreds of thousands of domestic persons, including but not limited to, federal employees in the NIH and the Commerce

---

[32] https://www.dni.gov/index.php/ncsc-what-we-do/ncsc-threat-assessments-mission/ncsc-economic-espionage
[33] Ibid. 18.

Department, scientist and researchers in academia, and even private employees like Plaintiff, who never has access to government computer systems nor to any classified information.

135. Defendants circumvented the public rule-making proceedings required by 5 U.S. Code § 553. The unprecedented authority, jurisdiction of the "China Initiative Working Group", and its unauthorized re-classification of commercial information into national security assets, were adopted without any notice or opportunity for public comment but have affected hundreds of thousands of domestic entities and persons whose affairs are controlled or regulated by Defendants.

136. Overnight, academic exchanges once encouraged by federal government and permitted by laws became suspicious espionage activities. Violations of grant rules, ethics rules, and conflicts of interest policy became felony offenses. In Plaintiff's case, a workplace infraction instantly became probable cause for a predawn raid by armed FBI agents.

137. This systemic abuse has resulted in widespread violations of Asian Americans' legal rights. The egregious FISA warrant abuses admitted by Defendant Wray in the Crossfire Hurricane Investigation were more frequently perpetrated against Mo, Xi, and other Chinese persons prior to and ever since the "China Initiative".

### *Inadequate Factfinding and Impact Analysis of the "China Initiative"*

138. Plaintiff incorporates the allegations above as if fully made herein.

139. In *Korematsu*, the Office of Naval Intelligence prepared a report, the Ringle Report, which concluded that very few Japanese represented a national security risk and that almost all of those who did were already in custody prior to Executive Order 9066.

140. The OTMP Report that triggered the "China Initiative" contains factfinding procedures, including but not limited to regulatory impact analysis, that are grossly biased and inadequate.

141. If the Pearl Harbor Attack and the Ringle Report never could have justified a mass internment of domestic Americans, the OTMP Report and Defendants' other assertions are grossly inadequate to support a dragnet counterintelligence program targeting a racial minority group.

142. Defendants failed to conduct regulatory impact analyses to assess the impact of the "China Initiative" on Asian American communities, despite its "Community Outreach" mission. To the contrary, the implicit prejudice ingrained in Defendant Wray's "Whole-of-Society Response" has spilled over to certain parts of the public, providing a motivational factor in the mass killing of Asians in Georgia and other violent attacks against Asian Americans. Defendants must bear responsibility for creating the prejudicial atmosphere which has demonized Asians based entirely on their race, and which is in danger of becoming rooted into the American ethos.

**CLAIMS FOR RELIEF**

*Count I: Plaintiff v. the U.S. Defendants*
*(Violation of the Separation of Powers and the Take Care Clause)*
*The "China Initiative" Exceeding Presidential War Powers and National Security Authority*

143. Plaintiff incorporates the allegations above as if fully made herein.

144. The U.S. Defendants, including President Biden, knew in advance that the Constitution grants Congress the sole power to declare wars and to make laws categorizing certain technologies, intellectual properties, scientific and technology information, commercial information, PII, PHI, and other hard and soft assets as national security assets.

145. Through their administrative fiats the U.S. Defendants made legislative rules without Congressional approval and without meeting the notice and comment requirements.

146. Furthermore, the enforcement of the "Whole-of-Society Response" through private employers in an undeclared economic espionage war is without authorization by Congress.

147. The U.S. Defendants, including President Biden, violated the Separation of Powers and the Take Care Clause by exceeding their constitutional boundaries, making laws, and invoking

national security authority without declaring a war of any kind.

### Count II: Plaintiff v. the U.S. Defendants
#### (Violation of the Fourth Amendment and the Take Care Clause)
#### Fabrication of Evidence and Unlawful Search and Seizure

148. Plaintiff incorporates the allegations above as if fully made herein.

149. Even if the U.S. Defendants had the legal authority to declare an economic espionage war, which they do not, the Constitution places domestic limits on the President and the Executive Branch during wars, unless the Commander in Chief declares martial law and suspends civil courts.

150. Plaintiff's injuries are traceable to *Korematsu* and Executive Order 9066. From the Japanese Internment to J. Edgar Hoover's "Chinese Scientist Program", to NSA's warrantless surveillance, and to the "China Initiative", the U.S. Defendants, including past presidents and Defendant President Biden, have abused and continue to abuse the war powers and national security authority with deliberate disregard toward civil liberty interests of Plaintiff.

151. The U.S. Defendants' "Whole-of-Society Response" unlawfully enticed, encouraged, or compelled Plaintiff's private employer to participate in counterintelligence operations.

152. The U.S. Defendants' "Whole-of-Society Response" empowered and encouraged Defendants Jane and John Does of the FBI, together with Plaintiff's private employer to act as government informants, and to willfully and deliberately fabricate evidence to support the first search warrant on Plaintiff's residence, even though Plaintiff had no access to government systems and had committed no crime under HIPAA or any other federal statutes.

153. When Defendants Jane and John Does raided Plaintiff's residence and then fraudulently applied for other search and seizure orders, Defendants caused and continue to cause an unreasonable search and seizure of Plaintiff's person, property, papers, and effects in violation of Plaintiff's privacy, property, and other rights and privileges under the Fourth Amendment.

154. The U.S. Defendants' "Whole-of-Society Response" represents a continuous Orwellian threat to Plaintiff's rights and privileges under the Fourth Amendment wherever and whenever he lives, works, travels within the United States.

155. The U.S. Defendants, including President Biden as Commander in Chief, willfully and deliberately abused the national security authority by exceeding the domestic limits set by the Constitution and therefore they have subverted the Constitution in violation of the Fourth Amendment, the Take Care Clause, and their respective Oaths of Office.

### Count III: Plaintiff v. the U.S. Defendants
### (Violation of the Fifth Amendment and the Take Care Clause)
### Fabrication of Evidence and Deprivation of Liberty and Properties

156. Plaintiff incorporates the allegations above as if fully made herein.

157. To date, the "China Initiative" has caused many persons of Chinese ancestry to lose their government jobs and private sector jobs by mere suspicions of their ordinary and customary contacts with persons or entities in China.

158. By willfully and deliberately fabricating evidence against Plaintiff the U.S. Defendants negatively impacted Plaintiff's liberty to travel, to work, to communicate, and to carry on other ordinary activities.

159. As a direct and proximate result of the U.S. Defendants' unlawful conduct, Plaintiff had to resign from a federal contractor position in 2020, and Plaintiff's prospects of stable income have been severely and irreversibly restricted.

160. The U.S. Defendants knew or should have known that, since 2014, Plaintiff used his Google account in communications with many attorneys and citizens to organize a class action challenging a gender-discrimination law called "Violence against Women Act". The FBI sought access to Plaintiff's account knowing that his Google account contains years of private and privileged communications.

161. The U.S. Defendants, including President Biden as Commander in Chief, willfully and deliberately abused the national security authority by exceeding the domestic limits and therefore had subverted the Constitution in violation of the Fifth Amendment, the Take Care Clause, and their Oaths of Office.

### Count IV: Plaintiff v. the U.S. Defendants
### (Violation of the Fifth and Fourteenth Amendments and the Take Care Clause)
### Deprivation of Equal Protection

162. Plaintiff incorporates the allegations above as if fully made herein.

163. Defendants have repeatedly presented unfounded claims of urgent national security to justify investigations and harassment of persons of Chinese ancestry without probable cause to do so.

164. The equal protection clauses of the Fifth and Fourteenth Amendments prohibit enforcement of criminal laws predicated on a domestic person's race, ethnicity, or national origin.

165. The U.S. Defendants, including President Biden, circumvented Congressional authorization prior to launching a race-based national security and counterintelligence program in an undeclared economic espionage war with China.

166. Without due process or constitutionally required legislative action, the U.S. Defendants, including President Biden, subjected Plaintiff to selective investigation and surveillance predicated on Plaintiff's race, ethnicity, or national origin.

167. The U.S. Defendants' ongoing practice to entice, encourage, or compel private sector employers to surveille and inform about persons of Chinese ancestry requires a vigorous legislative debate on admissibility of evidence and liabilities of private employers.

168. The U.S. Defendants, including President Biden, have willfully and deliberately disregarded the domestic limits placed by the equal protection clauses. The U.S. Defendants therefore had subverted the Constitution in violation of the Fifth and Fourteenth Amendments, and

the Take Care Clause.

### Count V: Plaintiff v. Agency Defendants Wray, Demers, FBI, and NSD
### (Violation of 5 U.S.C. § 706(2)(C))
### Agency Action in Excess of Statutory Authority

169. Plaintiff incorporates the allegations above as if fully made herein.

170. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

171. Agency Defendants' "China Initiative" is, in essence, a "Chinese Economic Espionage Act", which Defendants Wray and Demers have no authority to enact.

172. Congress has the sole power to make or amend laws, including but not limited to the Espionage Act and the Economic Espionage Act, and to re-categorize certain technologies, intellectual properties, scientific and technology information, commercial information, PII, PHI, and other hard and soft assets as national security assets.

173. Agency Defendants have no authority to make laws designating commercial and trade matters as national security matters. Agency Defendants have exceeded their statutory authority in violation the APA. The "China Initiative" must be declared to be unlawful, and its enforcement enjoined.

### Count VI: Plaintiff v. Agency Defendants Wray, Demers, FBI, and NSD
### (Violation of 5 U.S.C. § 706(2)(A)(B))
### Agency Action Arbitrary, Capricious, Not in Accordance with the Shanghai Communiqué,
### and Contrary to Constitutional Rights, Privileges, or Immunities
### under the Fifth and Fourteenth Amendments

174. Plaintiff incorporates the allegations above as if fully made herein.

175. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. §

706(2)(A)(B).

176. The Shanghai Communiqué of 1972 authorizes "mutual benefit" and "peaceful coexistence" with the Communist China. The bilateral executive agreement signed by President Nixon has the force of federal legislation, forming part of what the Constitution calls "'the supreme Law of the Land".

177. Only the President is authorized to rescind the Communiqué. Presidential family members, namely Neil Bush and Hunter Biden, son of Defendant President Biden, have profited and continue to profit from their respective business dealings with the Communist China. The "China Initiative" effectively rescinded the Communiqué and constitutes a final agency action that is arbitrary and capricious.

178. The business dealings and exchanges of information by Plaintiff and millions of domestic persons in the U.S. with ties to persons and entities in the Communist China are presumed to be lawful and in accordance with the Communiqué. See the three Joint Communiques in *Readout of President Biden's Virtual Meeting with President Xi Jinping of the People's Republic of China*. [34]

179. The "China Initiative" is not in accordance with the Due Process Clause of the Fifth Amendment because it deprives Plaintiff and millions of domestic persons in the U.S. of rights and privileges afforded by the Communiqué and the Constitution.

180. The "China Initiative" is not in accordance with the Equal Protection Clauses because it racially prioritizes surveillance, raids, investigations, or prosecutions, not of Neil Bush or Hunter Biden, but of Plaintiff and thousands of other domestic persons of Chinese ancestry. The "China Initiative" therefore must be declared to be unlawful, and its enforcement enjoined.

---

[34] https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/16/readout-of-president-bidens-virtual-meeting-with-president-xi-jinping-of-the-peoples-republic-of-china/

***Count VII: Plaintiff v. Agency Defendants Wray, Demers, FBI, and NSD***
***(Violation of 5 U.S.C. § 706(2)(D))***
***Agency Action without Observance of Procedure Required for Rulemaking***

181. Plaintiff incorporates the allegations above as if fully made herein.

182. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

183. In issuing substantive rules, federal agencies are required to follow the notice and comment process set forth in the APA. The agencies must publish a "[g]eneral notice of proposed rule making" in the Federal Register. 5 U.S.C. § 553(b). That notice must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

184. The agencies must further provide "interested persons" an "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

185. To comply with the APA's notice-and-comment requirements, the agency's final rule must be "a 'logical outgrowth' of the agency's proposed regulations." *Ass'n of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012). The agency "must itself provide notice of a regulatory proposal." Id. at 462 (internal quotation marks omitted). A final rule is not a logical outgrowth if "interested parties would have had to divine [the agency's] unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." Id. at 461 (internal quotation marks omitted).

186. The "China Initiative" was launched without any notice of proposed rulemaking to "interested persons" like Plaintiff. While Agency Defendants' "Whole-of-Society Response" calls for hundreds of thousands of public and private entities to participate in counterintelligence operations, Agency Defendants had failed to provide these interested parties with an opportunity

for public comments.

187. Agency Defendants have failed to follow the procedural requirements of the APA. The agency action therefore must be declared to be unlawful, and its enforcement enjoined.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court enter judgment in his favor and grant the following relief:

a. Declaring that *Korematsu v. United States*, 323 U.S. 214 is reversed and that the presidential powers during times of wars or other national security crisis may not be employed domestically absent due authorization by Congress and/or approval by a court of law;

b. Declaring that the "China Initiative" is unconstitutional because any power exercised by the President and the Executive Branch beyond normal constitutional constraints during times of national security crisis must be explicitly authorized by Congress, time-limited and reviewed by a court of law in each instance where it is exercised;

c. Declaring that the "China Initiative" is unlawful pursuant to 5 U.S.C. § 706(2)(A), (B), (C), (D), & (F);

d. Permanently enjoining Agency Defendants and their officers, employees, and agents from applying and enforcing the rules, regulations, and policies promulgated by the "China Initiative Working Group";

e. Vacating and setting aside the "China Initiative";

f. Ordering Defendants to release Plaintiff's personal properties and to expunge any and all of his FBI records;

g. Enjoining the Defendants to provide the Court, Congress, and the public with:

1. Summary reports on racial, ethnic, and national origin profiles of prosecutors, investigators, informants, and domestic targets of all FISA applications, past and present; and

2. Summary reports on racial, ethnic, and national origin profiles of prosecutors, investigators, informants, and domestic targets under the J. Edgar Hoover's "Chinese Scientist Program" and the "China Initiative";

h.  Awarding Plaintiff reasonable costs and expenses, including attorneys' fees; and

i.  Grant such other and further relief as this Court deems just and proper.

DATED: **JANUARY 31, 2022**

Respectfully Submitted,

/s/ **Weih Steve Chang**
_____
Weih Steve Chang
122 Pumpkin Patch Lane
Hockessin, DE 19707
302-494-9992