**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

WEIH STEVE CHANG,                          )
                                           )
                Plaintiff,                 )
                                           )
        v.                                 )        Civil Action No. 22-352 (RBW)
                                           )
UNITED STATES OF AMERICA,                  )
<u>et al.</u>,                             )
                                           )
                Defendants.                )
_____           )

## <u>MEMORANDUM OPINION</u>

The plaintiff, Weih Steve Chang, proceeding <u>pro se</u>, brings this civil action against the

defendants, the United States of America; Christopher Wray, in his official capacity as Director

of the Federal Bureau of Investigation ("FBI"); John Demers, in his official capacity as the

Assistant Attorney General of the United States; Joseph R. Biden Jr., in his official capacity as

President of the United States; and unnamed FBI agents John Doe(s) and Jane Doe.  <u>See</u>

Complaint for Declaratory and Injunctive Relief ("Compl.") ¶¶ 54–59, ECF No. 1.  The plaintiff

alleges violations of the separation of powers doctrine of the United States Constitution, <u>see</u> <u>id.</u>

¶¶ 143–47; Article II, Section 3 of the Constitution, <u>see</u> <u>id.</u> ¶¶ 143–168; the Fourth Amendment

to the Constitution, <u>see</u> <u>id.</u> ¶¶ 148–55; the Fifth Amendment to the Constitution, <u>see</u> <u>id.</u> ¶¶ 156–

168; the Fourteenth Amendment to the Constitution, <u>see</u> <u>id.</u> ¶¶ 162–68; and the Administrative

Procedures Act ("APA"), 5 U.S.C. § 706(2)(A)–(D), <u>see</u> <u>id.</u> ¶¶ 169–887.[1]  Currently pending

before the Court is the defendants' motion to dismiss the plaintiff's Complaint pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  <u>See</u> Defendant's Motion to Dismiss

---

[1] Much of the legal arguments advanced by the plaintiff are difficult to discern, but the Court has nonetheless done its best to construe what legal positions are being alleged by the plaintiff.

("Defs.' Mot.") at 1, ECF No. 9.  Upon careful consideration of the parties' submissions,[2] the

Court concludes for the following reasons that it must grant the defendants' motion to dismiss.

## I.      BACKGROUND

**A.      The China Initiative**

On November 1, 2018, then-Attorney General Jefferson Sessions announced a new law

enforcement effort dubbed the "China Initiative," stating that

> a report from U.S. Trade Representative Robert Lighthizer found that Chinese
> sponsorship of hacking into American businesses and commercial networks has
> been taking place for more than a decade and is a serious problem that burdens
> American commerce.  The problem has been growing rapidly, and along with
> China's other unfair trade practices, it poses a real and illegal threat to our
> nation's economic prosperity and competitiveness.

Attorney General Jeff Sessions Announces New Initiative to Combat Chinese Economic

Espionage, U.S. Dep't of Just. (Nov. 1, 2018), https://www.justice.gov/opa/speech/attorney-

general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage.[3]

In the same remarks, then-Attorney General Sessions announced that the China Initiative,

under the leadership of the Department of Justice ("Department") and the FBI, was intended to

"identify priority Chinese trade theft cases, ensure that we have enough resources dedicated to

the[se cases], and make sure that we bring the[se cases] to an appropriate conclusion quickly and

effectively."  Id.  The Department webpage dedicated to the China Initiative further describes the

effort as follows:

---

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum in Support of Defendants' Motion to Dismiss ("Defs.' Mem."), ECF No. 9-1; (2) the Plaintiff's Opposition to Defendants' Motion to Dismiss ("Pl.'s Opp'n"), ECF No. 11; and (3) the Reply in Support of Defendants' Motion to Dismiss ("Defs.' Reply"), ECF No. 12.

[3] The Court takes judicial notice of the transcript of Attorney General Session's remarks because it is available on the Department's public website.  See United States ex rel. Groat v. Boston Heart Diagnostics Corp., 255 F. Supp. 3d 13, 24 n.7 (D.D.C. 2017) (Walton, J.) ("[C]ourts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies." (quoting Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs., 43 F. Supp. 3d 28, 33 (D.D.C. 2014))).

About [eighty] percent of all economic espionage prosecutions brought by the [ ] Department [  ] allege conduct that would benefit the Chinese state, and there is at least some nexus to China in around [sixty] percent of all trade secret theft cases. The Department['s] [ ] China Initiative reflects the strategic priority of countering Chinese national security threats and reinforces the President's overall national security strategy. The Initiative was launched against the background of previous findings by the Administration concerning China's practices . . . .  In addition to identifying and prosecuting those engaged in trade secret theft, hacking, and economic espionage, the Initiative focuses on protecting our critical infrastructure against external threats through foreign direct investment and supply chain compromises, as well as combatting covert efforts to influence the American public and policymakers without proper transparency.

Information About the Department of Justice's China Initiative and A Compilation of China-Related Prosecutions Since 2018, U.S. Dep't of Just.,

https://www.justice.gov/archives/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related (last updated Nov. 19, 2021).[4]

On February 23, 2022, Assistant Attorney General Matthew Olsen announced that the China Initiative had been terminated following a review of the program conducted "soon after [he] took office."  Assistant Attorney General Matthew Olsen Delivers Remarks on Countering Nation-State Threats, U.S. Dep't of Just. (Feb. 23, 2022),

https://www.justice.gov/opa/speech/assistant-attorney-general-matthew-olsen-delivers-remarks-countering-nation-state-threats.  Assistant Attorney General Olson stated that the review was spurred by "concerns from the civil rights community that the 'China Initiative' fueled a narrative of intolerance and bias" against Chinese people or people of Chinese descent.  Id. Assistant Attorney General Olson further stated that the review conducted by his office evaluated

whether [the China Initiative] framework still best serves the strategic needs and priorities of the [D]epartment.  While I remain focused on the evolving, significant threat that the government of China poses, I have concluded that [the China Initiative] is not the right approach . . . .  I want to emphasize my belief that

---

[4] For the reasons set forth in footnote 3, supra, the Court takes judicial notice of the Department's webpage dedicated to information about the China Initiative because it is available on the Department's public website.

> the [D]epartment's actions have been driven by genuine national security concerns.  But by grouping cases under the China Initiative rubric, we helped give rise to a harmful perception that the [D]epartment applies a lower standard to investigate and prosecute criminal conduct related to that country or that we in some way view people with racial, ethnic or familial ties to China differently . . . . The [D]epartment is committed to protecting the civil rights of everyone in our country.  But this erosion of trust in the [D]epartment can impair our national security by alienating us from the people we serve, including the very communities the [Chinese] government targets as victims.

Id.  In addition, Assistant Attorney General Olsen emphasized that moving forward, the

Department was

> focused on the actions of the [Chinese] government, the Chinese Communist Party, and their agents—not the Chinese people or those of Chinese descent.  As we talk about the threats that the [Chinese] government poses to the United States, we must never lose sight of that fundamental distinction. We must always be vigilant to ensure that no one is treated differently based on race, ethnicity, familial ties, or national origin.

Id.


## B.   Factual Background

The following allegations are taken from the plaintiff's Complaint unless otherwise

specified.  See Compl.  The plaintiff alleges that "from November 2016 to November 2019," he

was employed by a private health insurance company and "worked remotely at his residence in

Delaware."  Id. ¶ 34.  In August 2019, the plaintiff alleges that his employer "went through a

major [information technology ('IT')] upgrade[,]" which resulted in the plaintiff being " issued

[a] new laptop[ ]" that the plaintiff alleges he was instructed to "test[ ] to assure that [the laptop

was] compliant with the security standards [of] the older company laptops."  Id. ¶ 35.  The

plaintiff's testing allegedly showed that the new laptop "was not as secure[ ] as the older laptop,"

id. ¶ 36, so the plaintiff "decided to experiment[,]" id. ¶ 36, with the new laptop "by running a

separate operating system for personal use[,]" id. ¶ 37.  On or about November 5, 2019, "this use

was detected" by plaintiff's employer, and "the Human Resources ('HR') and IT Security Departments contacted [the p]laintiff," about what he had done and he "readily admitted that he had used the computer for personal matters with the separate operating system he had installed on the new laptop and was ready to accept applicable consequences, including termination." Id. On November 8, 2019, the plaintiff "readily agreed" to his employer's instructions "to return all company equipment[.]" Id. ¶ 38. The plaintiff's employer also requested that the plaintiff "bring in his own external drive(s) when returning the company equipment." Id. The plaintiff "returned the [employer's] equipment, including both the old and new laptops, to [the employer's] Chief Security Officer," at the employer's headquarters on November 8, 2019. Id. ¶ 39. However, the Chief Security Officer "did not ask for any of [p]laintiff's personal belongings." Id. The plaintiff further alleges that "[b]etween November 8[ ] [, 2019] and November 15[ ] [, 2019], HR [personnel] contacted [the p]laintiff and demanded that he surrender his own external drive(s) to the company." Id. ¶ 40. The plaintiff refused to give the employer his personal drives and "offered to come to the company headquarters in person to sign an affidavit attesting that no disclosure of [protected health information] had ever occurred." Id.

On November 15, 2019, the plaintiff "received a phone call from a number with a 412 area code" on a phone whose number the plaintiff had not registered with his former employer. Id. ¶ 41. According to the plaintiff, "[t]he caller demanded that [the p]laintiff surrender his external drive(s)." Id. After the plaintiff hung up, the caller called again, at which point the plaintiff "promised to call back later in the evening when he returned to his residence." Id. The plaintiff returned the call later that evening and the person he spoke to "identified himself as someone from a law enforcement agency from Pittsburg[h], Pennsylvania and once again, demanded that [the p]laintiff return his personal drive(s) to the [former employer]." Id. The

plaintiff "suspected that he was being lied to and that the caller was merely pretending to be a law enforcement officer." Id.

The plaintiff alleges that his former employer "used [his] ethnicity and national origin against him to classify him as a Chinese 'nontraditional collector' of healthcare data in the United States and to assume he had committed a crime." Id. ¶ 44. The plaintiff claims that his former employer then "enlisted the aid of the FBI[,] which unquestioningly provided assistance[ ]" to the former employer. Id. The plaintiff further alleges that, "[o]n November 27, 2019, 'Squadron C' of the [FBI]," id. ¶ 4, executed a search warrant "of [the] plaintiff's residence" and seized "over 125 electronic devices," id. ¶ 33, that the FBI "retains to this day[,]" id. ¶ 44. The plaintiff further alleges that, on August 7, 2020, the FBI "sought another search warrant for [the p]laintiff's Google account." Id. ¶ 33.

"[The p]laintiff requested a copy of the first search warrant immediately after the raid[, but t]he FBI refused, repeatedly requesting that [p]laintiff be interviewed by its agents." Id. ¶ 50. "In October 2020[,] and nearly a year after the predawn raid, [the p]laintiff learned that the [FBI] sought [the] second search warrant for his Google account. [The p]laintiff again demanded a copy of the first search warrant and the government agreed this time." Id. ¶ 51. Upon reviewing the copy of the search warrant, the plaintiff alleges that "[he] immediately identified [ ] three demonstrably false statements . . . that [ ] [his former employer and the FBI used to] fraudulently establish[ ]probable cause." Id. The plaintiff therefore contends that the FBI "willfully and deliberately fabricate[d] evidence to support the first search warrant on [the p]laintiff's residence." Id. ¶ 152. The plaintiff further asserts that, "[b]ut for his Chinese

ancestry, the FBI would never have issued the search warrant,[5] nor would it have sought additional evidence against [the p]laintiff without first investigating the false allegations made by [the plaintiff's former employer]." Id. ¶ 33.

The plaintiff alleges that he was "one of the many thousands of suspects discriminated against and illegally targeted under the 'China Initiative,'" id. ¶ 4, and that,

> [o]n November 27, 2019, the FBI conducted a predawn raid of [his] residence on behalf of a private sector employer after [his former employer] fabricated a claim of hacking government computers and a claim of disclosing protected health information ("PHI") by [the p]laintiff. The FBI, without further investigation, used the [former employer]'s false, uninvestigated claims as probable cause for the search warrant. By August 7, 2020, after the FBI had obviously failed to gather sufficient evidence from over 125 electronic devices seized in the raid, it sought another search warrant for [the p]laintiff's Google account. But for his Chinese ancestry, the FBI would never have issued the search warrant, nor would it have sought additional evidence against [the p]laintiff without first investigating the false allegations made by a private company.

Id. ¶ 33. According to the plaintiff, "the raid at [hi]s residence and subsequent FBI fishing expeditions are supervised and coordinated by the "China Initiative Working Group[ ] in Washington D.C. because [the p]laintiff's extensive access to healthcare data is of great interest to the group." Id. ¶ 26. The plaintiff alleges that "over many months to the present day, [he] has seen a series of persistent email messages from a hacker group inviting him to attend its events online or in person," which the plaintiff suspects are "likely phishing attacks from the FBI, or its intelligence assets." Id. ¶ 52.

Moreover, the plaintiff alleges that pursuant to the China Initiative "the [former] government-sponsored program institutionalizes discrimination based on race [and was] falsely disguised as a national security program," id. ¶ 3, and which resulted in the "FBI [ ] target[ing]

---

[5] Although the plaintiff alleges that the FBI "issued the search warrant," id. ¶ 33, that apparently is the result of his misunderstanding of the warrant acquisition process, as the FBI can only seek to obtain a warrant, which can only be issued by a court.

citizens because of their Chinese ancestry[,]" id. ¶ 11.  According to the plaintiff, the FBI's

"decades-long practice of racial-profiling of persons including those of Chinese heritage

exemplifies the historic[al] and habitual abuse of its powers."  Id. ¶ 16.  In support of this claim,

the plaintiff states that,

> [o]n February 13, 2018, [defendant] Wray told the Senate Intelligence Committee
> that China had sent its spies as "[n]ontraditional [c]ollectors[,]"[ ] i.e., non-spies
> can be suspected to be spies simply because of their ancestry or any other links
> they may have to China.  The [FBI] is to "view the China threat as not just a
> whole of government threat but a whole of society threat on their end . . . [,] it's
> going to take a whole of society response by us.  [So] it's not just the intelligence
> community, but it's raising awareness within our academic sector, within our
> private sector as part of the defense.

Id. ¶ 22 (quoting Open Hearing on Worldwide Threats: Hearing Before the S. Select Comm. on

Intel., 115thCong. 45, 50 (2018) (statement of Christopher Wray, Director, Fed. Bureau of

Investigation)).

> The plaintiff further alleges that

> [t]he "Whole-of-Society Response" is a set of abusive rules, regulations and
> policies promulgated by the "China Initiative Working Group" to entice,
> encourage, or compel government employers and private sector employers,
> including academics, to form a surveillance society.  This opens the door to
> unfettered and uncontrolled spying on persons of Chinese heritage and confers on
> those persons doing so the aura of protecting national security. Like
> COINTELPRO[6], the "China Initiative" uses university administrators and other
> private employers as informants and assets acting as the eyes and ears of the FBI
> looking for "nontraditional collectors[.]"

Id. ¶ 23.

The plaintiff claims that "as the government did in Korematsu[ v. United States,

323 U.S. 214 (1944)], [the d]efendants knowingly, willfully, and deliberately devised and

---

[6] For background information regarding COINTELPRO, see generally COINTELPRO, Fed. Bureau of
Investigations, https://vault.fbi.gov/cointel-pro (last accessed July 8, 2023).  For the reasons set forth in footnote 3,
supra, the Court takes judicial notice of the FBI's webpage containing information regarding COINTELPRO
because it is available on the FBI's public website.

executed a racially predicated national security program of selective prosecution by designating

an entire ethnic group as 'fraudsters[,]'[ ] 'spies[,]'[ ] 'traitors[,]'[ ] or 'thieves[.]'[ ]" Id. ¶ 114.[7]

The plaintiff further alleges that

> Korematsu and the case at bar both illustrate how the President and the Executive
> Branch have abused and stretched their power and authority by issuing unlawful
> executive orders, launching arbitrary and capricious agency initiatives of selective
> prosecution of minorities, and promulgating abusive rules, regulations and
> policies which are facially discriminatory.

Id. ¶ 8.

> The plaintiff also claims that,

> [a]s a direct and proximate result of [the d]efendants' decades-long practice of
> racial profiling since Korematsu, all of which predate the "China Initiative", [the
> p]laintiff suffered substantial damages, including loss of liberty, invasion of
> privacy, substantial emotional distress and harm, loss of reputation, and physical
> harms caused by [ ] emotional distress, including difficulty sleeping, nightmares,
> difficulty focusing on daily tasks, and changed behavior in work practices. In
> addition, [the p]laintiff has suffered substantial economic damage, including loss
> of income and loss of future earnings, and costs and expenses of coping with [the
> d]efendants' ongoing unlawful conduct.

Id. ¶ 105.

## C.  Procedural Background

On January 28, 2022, the plaintiff filed his Complaint, see Compl. at 1, alleging, as noted

earlier, constitutional violations of (1) the separation of powers doctrine, see id. ¶¶ 143–47; (2)

Article II, Section 3 of the Constitution, see id. ¶¶ 143–47, 148–55, 156–61, 162–68; (3) the

Fourth Amendment, see id. ¶¶ 148–55; (4) the Fifth Amendment, see id. ¶¶ 156–61, 162–68; (5)

the Fourteenth Amendment, see id. ¶¶ 162–68; and (6) violation of the APA, see id. ¶¶ 169–73,

174–80, 181–87.  In response, on August 19, 2022, President Biden, Wray, Demers, and the

---

[7] Korematsu is the infamous decision upholding the forcible relocation of Japanese-Americans to concentration
camps during World War II.  See generally Korematsu, 323 U.S. 214.

United States filed their motion to dismiss.[8]  See Defs.' Mot. at 2.  On September 23, 2022, the

plaintiff filed his opposition to the defendants' motion, see Pl.'s Opp'n at 1, and on November 4,

2022, the defendants filed their reply in support of their motion, see Defs.' Reply at 5.

## II.    STANDARDS OF REVIEW

### A.    Rule 12(b)(1)

"Federal [district] courts are courts of limited jurisdiction[,]" Kokkonen v. Guardian Life

Ins. Co. of Am., 511 U.S. 375, 377 (1994), and "[a] motion for dismissal under [Federal Rule of

Civil Procedure] 12(b)(1) 'presents a threshold challenge to the [C]ourt's jurisdiction[,]'"

Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting Haase v.

Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)).  Thus, the Court is obligated to dismiss a claim if

it "lack[s] . . . subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Because "[i]t is to be

presumed that a cause lies outside [the Court's] limited jurisdiction," Kokkonen, 511 U.S. at 377,

the plaintiff bears the burden of establishing that the Court has subject-matter jurisdiction, see

Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

"In deciding a [Rule] 12(b)(1) motion, the [C]ourt need not limit itself to the allegations

of the complaint."  Grand Lodge of the Fraternal Ord. of Police v. Ashcroft, 185 F. Supp.

2d 9, 14 (D.D.C. 2001).  Rather, the "[C]ourt may consider such materials outside the pleadings

as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."

Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see Jerome

Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Additionally, the Court must "assume the truth of all material factual allegations in the complaint

---

[8] Although the plaintiff also brought this suit against "John and Jane Doe(s)[,]" Compl. ¶ 59, who are purportedly "federal law enforcement agents, supervisors, and other officials who participated in the . . . investigation of [the p]laintiff[,]" id., the motion to dismiss was not filed on behalf of the aforementioned John and Jane Doe defendants, see Defs.' Mem. at 1 n.1.

and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged[.]'" Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp., 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)).  However, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a [Rule] 12(b)(1) motion than in resolving a [Rule] 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13–14 (first and second alterations in original) (internal quotation marks omitted).

**B.     Rule 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) tests whether a complaint has properly "state[d] a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged."  Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).  While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth."  Iqbal, 556 U.S. at 679.  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678 (citing

Twombly, 550 U.S. at 555).  Also, the Court need not "accept legal conclusions cast as factual allegations" or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint[.]"  Hettinga, 677 F.3d at 476.  The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice."  Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## C.      Pro Se Complaints

Pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers."  Haines v. Kerner, 404 U.S. 519, 520 (1972).  See also Abdelfattah v. U.S. Dep't of Homeland Sec., 787 F.3d 524, 533 (D.C. Cir. 2015) ("A document filed pro se is to be liberally construed, . . . [thus, ]a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)).  However, "even a pro se complainant must plead 'factual matter' that permits the court to infer 'more than the mere possibility of misconduct.'"  Atherton v. District of Columbia, 567 F.3d 672, 681–82 (D.C. Cir. 2009) (quoting Iqbal, 556 U.S. at 679.  Furthermore, "[a] plaintiff's pro se status" means that "all filings by [the plaintiff] should be read together in assessing whether [his C]omplaint[ ] should be dismissed."  Khatri v. Bd. of Trs. of Univ. of Dist. of Columbia, No. 19-cv-2644, 2021 WL 2403087, at *6 (D.D.C. June 11, 2021) (Walton, J.) (internal citation omitted); see also Richardson v. United States, 193 F.3d 545, 548 (D.C. Cir. 1999) ("[T]he [d]istrict [c]ourt should have read all of [the pro se plaintiff]'s filings together before dismissing this case for lack of subject matter jurisdiction.").

# III.   ANALYSIS

The defendants move to dismiss the plaintiff's Complaint, arguing that (1) "the Court lacks jurisdiction over the Complaint because there exists no case or controversy" as to the plaintiff's claims based on Korematsu, Defs.' Mem. at 10; (2) the Court lacks jurisdiction over the Complaint because the plaintiff's claims about the China Initiative are moot, see id. at 12; and (3) "[the p]laintiff pleads no facts sufficient to state a claim for an unlawful search and seizure[,]" id. at 32; and (4) "[the p]laintiff fails to state a due process claim under the Fifth Amendment[,]" id. at 34.[9]   The defendants also argue that this Court "is not the appropriate venue for [the p]laintiff to seek return of his property" seized by the FBI.  Id. at 14.

In response, the plaintiff argues that (1) "racial stereotypes embedded in . . . Korematsu remain[s] the controversial legal bas[i]s upon which [the d]efendants will continue to rely to discriminate against [the p]laintiff[,]" Pl.'s Opp'n at 12; (2) that "the 'China Initiative' [ ] caused and continues to cause massive disruptions on hundreds of thousands of Americans whose affairs are controlled or regulated by [the d]efendants," id. at 15; (3) that "[t]he FBI [ ] deliberately failed to verify the [employer's] 'hacking' claim to falsely elevate the validity and urgency of its search warrant[,]" id. at 25–26; (4) that "[t]he 'Whole-of-Society Response' called for public-private partnership to surveille persons of Chinese heritage for espionage and economic espionage activities which implie[d] multiple levels of due process deprivation[,]" id. at 27, and (5) that the Court should postpone ruling on the plaintiff's request to return his property because the property is "not essential for seeking declaratory judgment and other injunctive relief," id. at 13.

---

[9] President Biden also moves to dismiss the plaintiff's Complaint because "[t]here is no basis for this Court to order equitable relief against the President."  Defs.' Mem. at 9.  The President is correct, Newdow v. Roberts, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him[.]"), and the Court ultimately concludes that the defendants, including the President, prevail on all of the plaintiff's claims for the reasons discussed below, infra.

Because "a court must first establish as an antecedent matter that it has jurisdiction[,]" Kaplan v. Cent. Bank of the Islamic Republic of Iran, 896 F.3d 501, 510 (D.C. Cir. 2018), the Court begins its analysis by addressing whether it has jurisdiction—namely, whether there is a case or controversy as required by Article III of the Constitution.

## A.      The Plaintiff's Korematsu Claim

The Court first addresses whether it has subject-matter jurisdiction to entertain the plaintiff's request that the Court overturn Korematsu.  While the Court ultimately resolves the issue on jurisdictional grounds, the Court seriously questions whether Korematsu remains good law considering what the Supreme Court said about the case in what is arguably only dicta in Trump v. Hawaii, 138 S. Ct. 2392, 2424 (2018) ("[T]he dissent's reference to Korematsu . . . affords this Court the opportunity to make express what is already obvious: Korematsu was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'") (quoting Korematsu, 323 U.S. at 248 (Jackson, J., dissenting)).

The defendants argue that the plaintiff's claim based on Korematsu must be dismissed because the claim fails to raise a "case or controversy" as Article III of the Constitution requires. Defs.' Mem. at 10.  In response, the plaintiff argues that "racial stereotypes embedded in . . . Korematsu remain[s] the controversial legal bas[i]s upon which [the d]efendants will continue to rely to discriminate against [the p]laintiff."  Pl.'s Opp'n at 12.  For the following reasons, the Court concludes that it lacks subject-matter jurisdiction over the plaintiff's claim based on Korematsu.

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'"  Allen v. Wright, 468 U.S. 737, 750 (1984).  "In an attempt to give

meaning to Article III's case-or-controversy requirement, the courts have developed a series of

principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and

the political question doctrine." Nat'l Treasury Emps. Union v. United States, 101

F.3d 1423, 1427 (D.C. Cir. 1996). If a plaintiff lacks Article III standing, a district court

> need not delve into [a plaintiff's] myriad constitutional and statutory claims . . .
> because a court may not resolve contested questions of law when its jurisdiction is
> in doubt, as [h]ypothetical jurisdiction produces nothing more than a hypothetical
> judgment—which comes to the same thing as an advisory opinion, disapproved
> by [the Supreme] Court from the beginning.

Am. Freedom L. Ctr. v. Obama, 106 F. Supp. 3d 104, 108 (D.D.C. 2015).

> [T]he irreducible constitutional minimum of standing contains three elements.
> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) "actual or
> imminent, not 'conjectural' or 'hypothetical[.]'" Second, there must be a causal
> connection between the injury and the conduct complained of—the injury has to
> be "fairly . . . trace[able] to the challenged action of the defendant, and not . . .
> th[e] result [of] the independent action of some third party not before the court."
> Third, it must be "likely," as opposed to merely "speculative," that the injury will
> be "redressed by a favorable decision."

Lujan, 504 U.S. at 560–61 (second, third, fourth, and fifth alterations in original) (citations

omitted). "The absence of any one of these three elements defeats standing." Newdow v.

Roberts, 603 F.3d 1002, 1010 (D.C. Cir. 2010).

Here, the Court concludes that the plaintiff has not established that his alleged injury is

"concrete and particularized." Lujan, 504 U.S. at 560. To be sufficiently "particularized," the

alleged injury "must affect the plaintiff in a personal and individual way." Id. at 560 n.1. The

Supreme Court has

> consistently held that a plaintiff raising only a generally available grievance about
> government—claiming only harm to his and every citizen's interest in proper
> application of the Constitution and laws, and seeking relief that no more directly
> and tangibly benefits him than it does the public at large—does not state an
> Article III case or controversy.

Id. at 573–74.  Further, "[t]he desire to obtain [sweeping relief] cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that his individual need requires the remedy for which he asks." Schlesinger v. Reservists Cmte. to Stop the War, 418 U.S. 208, 221–22 (1978).

Here, the plaintiff requests that this Court entertain his request to overturn Korematsu because he contends that the Supreme Court's holding in Korematsu "confer[red] unrestricted war powers on the government," id. ¶ 64, "established the "Separate but Equal" doctrine targeting Asian Americans under color of national security," id. ¶ 81, and permitted the FBI to engage in a "decades-long practice of racial-profiling of persons including those of Chinese heritage[,]" id. ¶ 16.  However, as the government correctly argues, see Defs.' Mem. at 11, these alleged harms are "nothing more than a generalized grievance [that conceivably might be] shared in substantially equal measure by all or a large class of citizens," which, without more, "normally does not warrant exercise of jurisdiction."  Williams v. Lew, 77 F. Supp. 3d 129, 134 (D.D.C. 2015), aff'd, 819 F.3d 466 (D.C. Cir. 2016) (internal quotation marks omitted).  Furthermore, "even when [the Supreme Court has] allowed litigants to assert the interests of others, the litigants themselves still must have suffered an injury in fact, thus giving [them] a sufficiently concrete interest in the outcome of the issue in dispute."  Hollingsworth v. Perry, 570 U.S. 693, 708 (2013) (internal quotation marks omitted).  Although asserting that the holding in Korematsu "justified discriminatory treatment of inhabitants of Puerto Rico and Japanese[-]Americans," Pl.'s Opp'n at 2, the plaintiff has not provided a factual basis to show that he has been harmed by the Korematsu holding in a "personal and individual way," Lujan, 504 U.S. at 560 n.1.  Thus, the plaintiff has not alleged an "injury in fact" that would "giv[e] [him] a sufficiently concrete interest in the outcome of [overturning Korematsu]," Hollingsworth, 570 U.S. at 708; see also

Menoken v. Miles, 270 F. Supp. 3d 200, 212 (D.D.C. 2017) ("[The plaintiff's] interest in protecting herself and the public from the executive branch's alleged unwillingness to follow the law [ ] does not constitute a concrete injury sufficient for Article III standing."); Common Purpose USA, Inc. v. Obama, 227 F. Supp 3d 21, 27 (D.D.C. 2016) ("The plaintiff's complaint is devoid of any concrete allegations, such as specific actions of the various [d]efendants or specific harms suffered by [the plaintiff]").

Because the plaintiff has failed to establish the existence of "[an injury in fact] sufficient to create a case or controversy under Article III," Hollingsworth, 570 U.S. at 694, the plaintiff does not have standing to pursue this claim. Accordingly, the Court concludes that it lacks subject-matter jurisdiction to even consider the relief of overturning Korematsu as requested by the plaintiff.[10] See Fed. R. Civ. P. 12(b)(1) (stating that the Court is obligated to dismiss a claim if it "lack[s] . . . subject-matter jurisdiction.").

## B.    The Plaintiff's China Initiative Claims

The Court now turns to the additional jurisdictional issue of whether the plaintiff's claims regarding the China Initiative are moot. Much of the plaintiff's allegations stem from constitutional challenges under the China Initiative, see generally Compl., however the plaintiff also makes specific allegations regarding the China Initiative under the Administrative Procedures Act ("APA"), see id. ¶¶ 169–187. As to the constitutional challenges, in Count I, the plaintiff alleges that "[t]hrough their administrative fiats the [ d]efendants made legislative rules without Congressional approval and without meeting the notice and comment requirements[,]" id. ¶ 145, which resulted in the defendants "violat[ing] the Separation of Powers and the Take

---

[10] To be clear, the Court emphasizes that even if it could exercise jurisdiction, the plaintiff fails to address what authority the Court would have to overturn a decision of the Supreme Court if in fact consideration of arguments based on Korematsu have any merit today.

Care Clause by exceeding their constitutional boundaries, making laws, and invoking national security authority without declaring a war of any kind[,]" id. ¶ 147.  The plaintiff also makes constitutional challenges under the China initiative in Counts II, III, and IV that the Court will discuss, infra, in Sections III.C, III.D, and III.E.

As to the APA challenge, in Count V, the plaintiff alleges that "[the d]efendants Wray and Demers ha[d] no authority to enact[ ]" what he contends through the "'China Initiative' is, in essence, a 'Chinese Economic Espionage Act.'" Id. ¶ 171.  In Count VI, the plaintiff alleges that the China initiative "rescinded the [Shanghai] Communique [of 1972] and constitutes a final agency action that is arbitrary and capricious."  Id. ¶ 177.  In Count VII, the plaintiff further alleges that the China Initiative "was launched without any notice of proposed rulemaking to 'interested persons' like [the p]laintiff."  Id. ¶ 186.  The Court will address the allegations in each Count.  In his Complaint, the plaintiff articulates his requests for relief concerning his claims regarding the China Initiative as the following: (1) a declaration that "the 'China Initiative' is unconstitutional," Compl. at 37; (2) a declaration that "the 'China Initiative' is unlawful pursuant to 5 U.S.C. § 706(2)(A), (B), (C), (D), & (F)," id.; (3) a permanent injunction prohibiting "[the d]efendants and their officers, employees, and agents from applying and enforcing the rules, regulations, and policies promulgated by the 'China Initiative Working Group,'" id.; (4) the "[v]acat[ur] and set[ting] aside [of] the 'China Initiative,'" id.; and (5) an order compelling "the [d]efendants to provide the Court, Congress, and the public with . . . [s]ummary reports on racial, ethnic, and national origin profiles of prosecutors, investigators, informants, and domestic targets under . . . the 'China Initiative[,]'" id. at 38.

The defendants assert that the plaintiff's claims regarding the China Initiative are moot because "the [ ] Department discontinued the China Initiative in February 2022," and therefore

"[the p]laintiff's entire case is premised upon obtaining declaratory relief concerning an initiative that is no longer ongoing, and obtaining injunctive relief prohibiting actions in furtherance of that discontinued initiative."  Defs.' Mem. at 12.  In response, the plaintiff argues that the "discontinuation of the 'China Initiative' [ ] caused and continues to cause massive disruptions [to] hundreds of thousands of Americans whose affairs are controlled or regulated by [the d]efendants" and alleges that "[d]efendant Wray continues to spread disinformation about the purportedly perilous nature of having normal interactions with people and entities in the People's Republic of China."  Pl.'s Opp'n at 15.

Again, the Court notes that "Article III of the Constitution restricts the federal courts to deciding only 'actual, ongoing controversies,'" Nat'l Black Police Ass'n v. District of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997) (quoting Honig v. Doe, 484 U.S. 305, 317 (1988)), and "a federal court has no 'power to render advisory opinions [or] . . . decide questions that cannot affect the rights of litigants in the case before them[,]'" id. (internal quotation marks omitted) (quoting Preiser v. Newkirk, 422 U.S. 395, 401 (1975)).  Moreover, "[e]ven where litigation poses a live controversy when filed, . . . [the C]ourt [must] refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'"  Clarke v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990) (quoting Transwestern Pipeline Co. v. Fed. Energy Regul. Comm'n, 897 F.2d 570, 575 (D.C. Cir. 1990)).  Additionally, "[a] party may lack a legally cognizable interest in the outcome [of a case] 'when, among other things, the court can provide no effective remedy because a party has already obtained all the relief it has sought[.]'"  Indian River Cnty. v. Rogoff, 254 F. Supp. 3d 15, 18 (D.D.C. 2017) (internal quotation marks omitted) (quoting Conservation Force, Inc. v. Jewell, 733 F.3d 1200, 1204 (D.C. Cir. 2013)).

However, "to obtain prospective injunctive relief, a plaintiff must show a real and immediate threat of future injury to establish a viable case or controversy." Johnson v. District of Columbia, 248 F.R.D. 46, 56 (D.D.C. 2008) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 103–04 (1983).  When a plaintiff seeks injunctive relief, he may not "simply rely on past injury to show standing."  Johnson, 248 F.R.D. at 56.  Indeed, the plaintiff must establish that he has "sustained[,]" id., or is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,]" Lyons, 462 U.S. at 101–02.  The "injury or threat of injury must be both real and immediate, not conjectural or hypothetical."  Id. at 102; see also O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.").

There are two exceptions to the mootness doctrine.  First, under the "capable of repetition, yet evading review" exception, a case is not rendered moot where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."  Ill. Elections Bd. v. Socialist Workers Party, 440 U.S. 173, 187 (1979) (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam)).  Second, under the "voluntary cessation" exception, "voluntary cessation of allegedly illegal conduct does not [automatically] deprive [a court] of power to hear and determine the case[.]"  Cnty. of L.A. v. Davis, 440 U.S. 625, 631 (1979) (internal quotation marks omitted).  Rather, voluntary cessation will only moot a case if "there is no reasonable expectation . . . that the alleged violation will recur," and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  Id.  "The party seeking jurisdictional dismissal must establish mootness,

while the opposing party has the burden to prove that a mootness exception applies." Reid v. Hurwitz, 920 F.3d 828, 832 (D.C. Cir. 2019).

The Court will first analyze whether the defendants have met their burden to establish mootness, before considering whether the plaintiff has demonstrated that either of the two exceptions to the mootness doctrine applies.

### 1. Whether the Defendants Have Met Their Burden to Establish Mootness

The defendants must first satisfy the "initial heavy burden of establishing mootness." Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n, 628 F.3d 568, 576 (D.C. Cir. 2010) (internal quotation marks omitted). The defendants contend that, "[t]o the extent [the p]laintiff seeks a ruling declaring the China Initiative unconstitutional and unlawful, [the p]laintiff's claims are [ ] moot" because "the [ ] Department discontinued the China Initiative in February 2022." Defs.' Mem. at 12. In support of this position, the defendants argue that "[a] case is moot when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated in circumstances where it becomes impossible for a court to grant any effectual relief to the prevailing party.'" Id. (citing United States v. Philip Morris USA, Inc., 566 F.3d 1095, 1135 (D.C. Cir. 2009)). The defendants further argue that this Court should dismiss the plaintiff's claims pertaining to the China Initiative as moot because "[the p]laintiff's entire case is premised upon obtaining declaratory relief concerning an initiative that is no longer ongoing, and obtaining injunctive relief prohibiting actions in furtherance of that discontinued initiative," Defs.' Mem. at 12. In response, the plaintiff argues that, "[d]espite the discontinuation of the China Initiative":

1. "[d]efendant Wray continues to deliberately spread disinformation about the FBI's racial profiling practice[,]" Pl.'s Opp'n at 8.

2. "[d]efendant Wray continues to spread disinformation about the purportedly perilous nature of having normal interactions with people and entities in the People's Republic of China[,]" id. at 15; and

3. "the discontinuation of the 'China Initiative' [ ] caused and continues to cause massive disruptions on hundreds of thousands of Americans whose affairs are controlled or regulated by [the d]efendants[,]" id.

The APA "creates a 'basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 139 S. Ct. 361, 370 (2018) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 140 (1967) (alterations in original)); see also 5 U.S.C. § 702.  However, "[a] case is moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" Akiachak Native Cmty. v. U.S. Dep't of Interior, 827 F.3d 100, 105 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 396 (1980)). In other words, for a case to be justiciable, the Court's disposition of the claims must "affect the rights of litigants in the case before [it,]" Preiser, 422 U.S. at 401, and "[the C]ourt [must] refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more than speculative chance of affecting them in the future[,]'" Clarke, 915 F.2d at 701 (quoting Transwestern Pipeline Co., 897 F.2d at 575).  Moreover, where the claims are founded on the invalidity of a policy or regulation and "that regulation no longer exists, [the Court] can do nothing to affect [the plaintiffs'] rights relative to it, thus making th[e] case classically moot for lack of a live controversy."  Akiachak Native Cmty., 827 F.3d at 106; see Larsen v. U.S. Navy, 525 F.3d 1, 4 (D.C. Cir. 2008) ("[B]ecause the [agency has] already eliminated the [challenged p]olicy and [the] plaintiffs never allege that the [agency] will

reinstitute it, any injunction or order declaring it illegal would accomplish nothing—amounting

to exactly the type of advisory opinion Article III prohibits.").  This rule applies with equal force

to claims for declaratory relief.  See Diffenderfer v. Cent. Baptist Church of Mia. Inc., 404

U.S. 412, 414–15 (1972) (dismissing as moot a request for a declaratory judgment regarding the

unconstitutionality of a statute because the "relief [was], of course, inappropriate [given] that the

statute ha[d] been repealed").

     Regarding the plaintiff's requests for injunctive relief related to the China Initiative, see

supra, Section III.B, the defendants have met their initial burden of establishing that these claims

are moot.  Although the Court questions whether it has the authority to review the China

Initiative under the APA, Defs.' Mem. at 16 ("[t]he China Initiative is not a statute, regulation,

rule, or even agency action[11] as the APA defines those terms"), the Court, in any event, "lacks

jurisdiction to decide [the] case[,]" Larsen, 525 F.3d at 4, because there is no current "actual

case[ ] or controversy[,]" id., for the Court to consider, the Department having discontinued the

China Initiative in February 2022,  see Assistant Attorney General Matthew Olsen Delivers

Remarks on Countering Nation-State Threats, U.S. Dep't of Just. (Feb. 23, 2022),

https://www.justice.gov/opa/speech/assistant-attorney-general-matthew-olsen-delivers-remarks-

countering-nation-state-threats.[12]  This cessation of the China Initiative renders the declaratory

---

[11] Cf. Crowley Caribbean Transport, Inc. v. Pena, 37, F.3d 671, 677 (D.C. Cir. 1994) ("As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are . . . within the agency's expertise and discretion."); see also MediNatura, Inc. v. Food & Drug Admin., 496 F. Supp. 3d 416, 445 (D.D.C. 2020) ("[A]n agency's decision not to enforce mirrors a prosecutor's decision not to bring charges, the latter of which has long been regarded as a matter of unreviewable discretion.") (citing Heckler v. Chaney, 470 U.S. 821, 832 (1985)); see also United States v. Simmons, No. 18-cr-344 (EGS), 2022 WL 1302888, at *10 ("[W]ith respect to criminal charging decisions, the Supreme Court has made clear that the government's decision as to whom to prosecute is generally unreviewable.") (internal quotation marks omitted) (quoting Secretary of Labor v. Twentymile Coal Co., 456 F.3d 151 (D.C. Cir. 2006)).

[12] For the reasons set forth in footnote 3, supra, the Court takes judicial notice of the transcript of Assistant Attorney General Olson's remarks because it is available on the Department's public website.

and injunctive relief requested by the plaintiff, <u>see</u> Compl. at 37 (requesting the Court "enjoin[ ] Agency [d]efendants and their officers, employees, and agents from applying and enforcing the rules, regulations, and policies promulgated by the 'China Initiative Working Group'"), of no practical effect because "[the Court] can do nothing to affect [the plaintiff's] rights relative to" the terminated program, "thus making this case classically moot for lack of a live controversy[,]" <u>Akiachak Native Cmty.</u>, 827 F.3d at 106; <u>see id.</u> (dismissing as moot a claim challenging a regulation which was subsequently rescinded); <u>see also</u> <u>Nat'l Black Police Ass'n</u>, 108 F.3d at 349 (dismissing as moot a challenge to District of Columbia campaign contribution limits because an "intervening event [ ] end[ed] any live controversy between [the] plaintiffs and the [defendant]" when "the [defendant] enact[ed] [ ] new campaign contribution legislation"); <u>MoveCorp v. Small Bus. Admin.</u>, No. 20-cv-1739, 2021 WL 3144943, at *4 (D.D.C. July 26, 2021) (dismissing as moot a claim challenging an agency rule that was subsequently superseded by a later version such that it "no longer present[ed] a live controversy").  Accordingly, the Court concludes that the defendants have met their burden of establishing that the plaintiff's claims relating to the China Initiative are moot.

## 2.  Exceptions to the Mootness Doctrine

Having concluded that the defendants have met their burden to demonstrate that the plaintiff's claims about the China Initiative are moot, the Court must next determine whether the plaintiff has demonstrated that either of the exceptions to the mootness doctrine apply in this case.

### a.  The Capable of Repetition, Yet Evading Review Exception

The Court begins with the first of the two exceptions to the mootness doctrine, <u>i.e.</u>, whether the plaintiff's claims about the China Initiative are "capable of repetition, yet evading

review[.]" Weinstein, 423 U.S. at 149.  In evaluating the applicability of this exception, the

Court is mindful of the fact that the plaintiff, as "the opposing party[,] has the burden to prove

that a mootness exception applies." Reid, 920 F.3d at 832.[13]

 "[E]ven though the specific action that the plaintiff challenges has ceased, a claim for

declaratory relief will not be moot" if "the specific claim fits the exception for cases that are

capable of repetition, yet evading review." Del Monte Fresh Produce Co. v. United

States, 570 F.3d 316, 321 (D.C. Cir. 2009).  "The capable of repetition but evading review

exception applies if '(1) the challenged action was in its duration too short to be fully litigated

prior to its cessation or expiration,'" i.e., "the evading review" prong, and "'(2) there was a

reasonable expectation that the same complaining party would be subjected to the same action

again[,]'" i.e., the "capable of repetition" prong. J.T. v. District of Columbia, 983 F.3d 516, 523

(D.C. Cir. 2020) (quoting Weinstein, 423 U.S. at 149).

 Regarding the first prong of the analysis, "[t]o evade review, the challenged action must

be incapable of surviving long enough to undergo Supreme Court review." United Bhd. of

Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l Ass'n of the U.S.

& Can., 721 F.3d 678, 688 (D.C. Cir. 2013).  Generally, "agency actions of less than two years'

duration cannot be fully litigated prior to cessation or expiration, so long as the short duration is

typical of the challenged action." Del Monte Fresh Produce Co., 570 F.3d at 322 (internal

quotation marks omitted).  However, "[this] Circuit['s] precedent [also] requires [the Court] to

determine whether the activity challenged is inherently of a sort that evades review[.]" Campbell

v. Clinton, 203 F.3d 19, 34 (D.C. Cir. 2000) (internal quotation marks omitted) (emphasis

---

[13] Although the parties do not address either of the two exceptions to the mootness doctrine in their filings, the Court
will address both exceptions because it is obligated to sua sponte address whether it has subject-matter jurisdiction
even if the parties do not. See Fed. R. Civ. P. 12(h)(3); Poblete v. U.S. Marshals Service, 207 F. Supp. 3d 1, 2
(D.D.C. 2016) ("[S]ubject matter jurisdiction may not be waived, and . . . courts may raise the issue sua sponte.").

added).  Thus, the challenged action must, in and of itself, be so time-bound that it evades

review.  See Grant v. Vilsack, 892 F. Supp. 2d 252, 258 (D.D.C. 2012) ("The 'capable of

repetition[, yet evading review]' exception applies to claims that are inherently short-lived.");

compare, e.g., id. at 257–58 (concluding that the challenged action did not evade review because

"the alleged wrong"—namely, an agency's deregulation decision—"[could] arise in a context

with ample time for review"), with Jenkins v. Squillacote, 935 F.2d 303, 307 (D.C. Cir. 1991)

("[T]here can be no doubt that a one-year placement order under the [Individuals with

Disabilities Education Act] is, by its nature, too short [in duration] to be fully litigated prior to its

. . . expiration." (internal quotation marks omitted) (emphasis added)).  So in other words, this

Circuit "also adds in an additional requirement that a given action must meet before it results in

an application of this exception: that 'the short duration is typical of the challenged action.'"

People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv., 59 F. Supp.

3d 91, 97 (D.D.C. 2014) (quoting Del Monte Fresh Produce Co., 570 F.3d at 322).

     Here, the underlying action challenged by the plaintiffs is neither "inherently

short-lived[,]" Grant, 892 F. Supp. 2d at 258, nor typically "short [in] duration[,]" People for the

Ethical Treatment of Animals, Inc., 59 F. Supp. 3d at 97.  The plaintiff himself alleges in his

Complaint that the Department announced the China Initiative on November 1, 2018, see Compl.

¶ 3.  As already mentioned, see supra Section III.B.1, the Department formally ceased the China

Initiative on February 23, 2022, see Assistant Attorney General Matthew Olsen Delivers

Remarks on Countering Nation-State Threats, U.S. Dep't of Just. (Feb. 23, 2022),

https://www.justice.gov/opa/speech/assistant-attorney-general-matthew-olsen-delivers-remarks-

countering-nation-state-threats.  Thus, the China Initiative was in effect for roughly three years

and four months, which is significantly longer than the two years that is generally considered

insufficient to "fully litigate[ agency claims] prior to cessation or expiration[,]" <u>Del Monte Fresh Produce Co.</u>, 570 F.3d at 322.  Furthermore, the plaintiff makes no allegation, <u>see generally</u> Compl.; Pl.'s Opp'n, that any future initiative would be of a "short duration . . . <u>typical</u> of the challenged action[,]" <u>id.</u> (emphasis added).  <u>See</u> <u>People for the Ethical Treatment of Animals, Inc.</u>, 59 F. Supp. 3d at 97 (concluding that the plaintiff's challenge to Secretary's issuance of certain permits did not evade review, based upon the plaintiff's failure to establish typicality, even where the plaintiff presented evidence that "[twenty-one] of [a total of ninety-five permitting applications] had durations of less than three years").

For the foregoing reasons, the Court concludes that the plaintiff has not met his burden of establishing that "the challenged action was in its duration too short [in time] to be fully litigated prior to its cessation or expiration[.]"  <u>Weinstein</u>, 423 U.S. at 149.  And, because the "capable of repetition, yet evading review" test "requires that the challenged action be <u>both</u> capable of repetition <u>and</u> evading review[,]" <u>People for the Ethical Treatment of Animals, Inc.</u>, 59 F. Supp. 3d at 97 (citing <u>Weinstein</u>, 423 U.S. at 149) (emphasis in original), and "a deficiency in one area renders the exception itself moot[,]" <u>id.</u>, the Court need not reach the second prong of the analysis—namely, whether the challenged action is capable of repetition, <u>see id.</u> at 97–98 (basing the court's decision as to the "capable of repetition, yet evading review" exception on its dispositive determination regarding the "evading review" prong).  Accordingly, the Court concludes that the "capable of repetition, yet evading review" exception does not apply in this case.

### b.    The Voluntary Cessation Exception

Having concluded that the "capable of repetition, yet evading review" exception does not apply in this case, <u>see supra</u> Section III.B.1.a, the Court must next consider whether the second

exception to the mootness doctrine—the "voluntary cessation" exception—applies.  Again, in evaluating the application of exceptions to the mootness doctrine, the Court is mindful of the fact that the plaintiff, as "the opposing party[,] has the burden to prove that a mootness exception applies."  Reid, 920 F.3d at 832.

The "voluntary cessation" exception to the mootness doctrine "prevent[s] a [ ] defendant from manipulating the judicial process by voluntarily ceasing the complained of activity, and then seeking a dismissal of the case, thus securing freedom to 'return to his old ways.'" Clarke, 915 F.2d at 705.  Under this exception, "[a] defendant's voluntary decision to cease the activities that gave rise to the suit extinguishes the live controversy[ ] 'only if (i) there is no reasonable expectation that the alleged violation will recur, and (ii) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'"  Citizens for Resp. & Ethics in Wash. v. Wheeler, 352 F. Supp. 3d 1, 13 (D.D.C. 2019) (quoting Aref v. Lynch, 833 F.3d 242, 251 (D.C. Cir. 2016)).  However, this Circuit has been skeptical of applying this exception to agency actions.  See Alaska v. U.S. Dep't of Agric., 17 F.4th 1224, 1227 (D.C. Cir. 2021) (stating that the Circuit has expressed "'serious doubts' about whether the 'voluntary cessation' rationale appl[ies] to cases . . . [involving agency action]: 'it would seem inappropriate for the courts either to impute such manipulative conduct to a coordinate branch of government, or to apply against that branch a doctrine that appears to rest on the likelihood of a manipulative purpose'" (quoting Clarke, 915 F.2d at 705)).

Regarding the first prong of the "voluntary cessation" exception, namely, whether "there is no reasonable expectation [ ] that the alleged violation will recur," Aref, 833 F.3d at 251, where "the defendant is a government actor—and not a private litigant—there is less concern about the recurrence of objectionable behavior[,]" Citizens for Resp. & Ethics in Wash. v. Secs.

28

& Exch. Comm'n, 858 F. Supp. 2d 51, 61 (D.D.C. 2012).  The mere power to put in place a particular policy is "not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists."  Nat'l Black Police Ass'n, 108 F.3d at 349.  "Rather, there must be evidence indicating that the challenged [policy] likely will be re[instated]."  Id. (emphasis added); see also Larsen, 525 F.3d at 4 (finding that there was "no reasonable expectation . . . that the alleged violation will recur" where "the Navy has never said it will reenact [its terminated religious quota policy], and [the] plaintiffs have not even alleged as much." (internal quotation marks omitted)).

Here, regardless of whether it was a true agency action, the Department has formally ceased the China Initiative and announced a "much broader approach" to countering espionage threats from the Chinese government and those who act on its behalf.  See Assistant Attorney General Matthew Olsen Delivers Remarks on Countering Nation-State Threats, U.S. Dep't of Just. (Feb. 23, 2022), https://www.justice.gov/opa/speech/assistant-attorney-general-matthew-olsen-delivers-remarks-countering-nation-state-threats.  In his remarks discontinuing the China Initiative, Assistant Attorney General Olsen stated that "[t]he Department will continue to prioritize and aggressively counter the actions of the [Chinese] government that harm our people and our institutions[, b]ut our review convinced us that a new approach is needed" against "the current threat landscape" and in light of "concerns from the civil rights community that the 'China Initiative' fueled a narrative of intolerance and bias" against Asian-Americans and persons of Chinese heritage.  Id.  In his opposition to the defendants' motion to dismiss, the plaintiff, in conceding that the China Initiative has been rescinded, argues that the "discontinuation of the 'China Initiative' [ ] caused and continues to cause massive disruptions on hundreds of thousands of Americans whose affairs are controlled or regulated by [the

d]efendants." Pl.'s Opp'n at 15. The plaintiff further alleges that "[d]espite the discontinuation of the 'China Initiative in February 2022, [d]efendant Wray continues to spread disinformation about the purportedly perilous nature of having normal interactions with people and entities in the People's Republic of China." Id. However, neither of these allegations provide "evidence indicating that the challenged [policy] likely will be re[instated][,]" Nat'l Black Police Ass'n, 108 F.3d at 349, nor does the plaintiff make any other allegations to that effect, see generally Compl.; Pl.'s Opp'n. As the plaintiff has not alleged that any of the defendants "[are] likely to or even considering reinstituting" the China Initiative, the Court concludes that there is "no reasonable expectation . . . that the alleged violation will recur." Larsen, 525 F.3d at 4 (internal quotation marks omitted).

Regarding the second prong of the "voluntary cessation" exception, namely, whether "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation[,]" Aref, 833 F.3d at 251 (quoting Am. Bar Ass'n v. Fed. Trade Comm'n, 636 F.3d 641, 648 (D.C. Cir. 2011)), "[t]he determination whether sufficient effects [of the alleged violation] remain . . . will turn on the availability of meaningful relief." Cierco v. Lew, 190 F. Supp. 3d 16, 24 (D.D.C. 2016) (second alteration in original). Accordingly, "[a] case is not moot if a court can provide an effective remedy," Lewis v. Becerra, No. 18-cv-2929, 2023 WL 3884595, at *13 (D.D.C. June 8, 2023) (Walton, J.) (quoting Larsen, 525 F.3d at 4). Here, the plaintiff seeks several forms of equitable relief from this Court for his claims relating to the China Initiative—namely, (1) a declaration that the China Initiative was unconstitutional and unlawful, ; (2) a permanent injunction barring the defendants from "applying and enforcing the rules, regulations, and policies promulgated by the 'China Initiative Working Group'"; and (3) an order "vacating and setting aside the 'China Initiative[.]'" Compl. at 37. Again, because the

Department has already terminated the China Initiative and the plaintiff has not alleged that the Department or the defendants "[are] likely to or even considering reinstituting" it, "any injunction or order declaring it illegal would accomplish nothing—amounting to exactly the type of advisory opinion Article III prohibits." Larsen, 525 F.3d at 4. Given that the plaintiff offers no basis on which the Court can conclude that "there is [a] reasonable expectation" that the China Initiative "will recur," Aref, 833 F.3d at 251, and that this Court could provide a meaningful remedy to the plaintiff, the Court concludes that the "voluntary cessation" exception also does not apply in this case.

Accordingly, the Court concludes that, to the extent the plaintiff seeks prospective relief from the China Initiative—viz., declaratory and injunctive relief—his constitutional and APA claims are moot because "intervening events have [ ] 'irrevocably eradicated the effects of the alleged violation.'" Lyons, 461 U.S. at 101 (quoting Cnty. of L.A., 440 U.S. at 631). Consequently, the plaintiff having failed to establish that either of the above-referenced exceptions to mootness apply in this case, the Court concludes that it must dismiss as moot Counts I, V, VI, and VII of the plaintiff's Complaint.

However, the plaintiff's claims seeking retrospective relief—e.g., presumably damages as part of the "other" relief being requested, Compl. at 38—for alleged constitutional violations survive the defendants' mootness position because the plaintiff has alleged that he has sustained some injury that is "[ ]accompanied by [ ] continuing, present [and] adverse effects[,]" O'shea, 414 U.S. 495–96, allegedly redressable by the Court, Lyons, 461 U.S. at 101–02 ("The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged [ ] conduct[ ]"); see Compl. ¶¶ 148–168 (alleging violations under the Fourth, Fifth, and Fourteenth Amendments); see id. at 37 (requesting that the Court

"[o]rder[ the d]efendants to release [the p]laintiff's personal properties and to expunge any and all of his FBI records[ ]"); id. at 38 (requesting an "[a]ward[ for the p]laintiff [for] reasonable costs and expenses, including attorneys' fees[ ]"); id. (requesting the Court "[g]rant such other and further relief as . . . deem[ed] just and proper[ ]").  Accordingly, the Court will address the merits of those claims next.

**C.      The Plaintiff's Fourth Amendment Claim**

Having dismissed the plaintiff's claims based on Korematsu and the China Initiative for lack of subject-matter jurisdiction, the Court will now address the plaintiff's Fourth Amendment claim challenging the validity of the search warrant executed by the FBI at his residence.

The plaintiff alleges that,

> [o]n November 27, 2019, the FBI conducted a predawn raid of [his] residence on behalf of a private sector employer after [his former employer] fabricated a claim of hacking government computers and a claim of disclosing protected health information ("PHI") by [the p]laintiff.  The FBI, without further investigation, used the [former employer]'s false, uninvestigated claims as probable cause for the search warrant.

Compl. ¶ 33.  The plaintiff further alleges that upon receipt of a copy of the search warrant executed at his residence, "[he] immediately identified [ ] three demonstrably false statements . . . that [ ] [his former employer and the FBI used to] fraudulently established probable cause." Id. ¶ 51.  Specifically, the plaintiff alleges that "[his former employer] and the FBI knowingly and willfully lied in support of the search warrant[, by] stating that:" (1) "'as part of [the plaintiff's] duties, [the plaintiff] was responsible for using a laptop computer[ . . . ]and transmitting relevant data to various state regulatory agencies nationwide[ . . . ,]'" id. ¶ 45; (2) "that '[ ] security personnel knew that [the plaintiff's] statement [about experimenting with a USB-C port to run a separate operating system for personal use] was false because the laptop does not have a Thunderbolt or USB-C connection[,]'" id. ¶ 46; and (3) "that on or about

November 8th, 2019, '[the plaintiff][ . . . ]was trying to get into his office[,]" which the plaintiff, [a]s a telework employee, does not have an office in the building[,]'" id. ¶ 47.

To rebut these allegedly false statements, the plaintiff asserts (1) that "[he] never had access to any government agency computer systems and had never needed to modify any computer to gain access to 'relevant data[,]'" id. ¶ 45; (2) that "[t]he laptop identified as 'a brand new HP Elitebook 840 G6' does have a 'USB 3.1 Type-C port (with Thunderbolt support)' according to its manufacturer's website[,]" id. ¶ 46; and (3) that [the p]laintiff and other tele[ ]workers do have an office area which they routinely use when coming into the office[,]" and "[the p]laintiff had no intention to enter the building on [November 8, 2019,] and did not even bring his ID badge[ presumably for the purpose of gaining entry into the building,]" id. ¶ 47. The plaintiff therefore contends that the FBI "willfully and deliberately fabricate[d] evidence to support the [ ] search warrant on [the p]laintiff's residence." Id. ¶ 152. The plaintiff further claims that "[b]ut for his Chinese ancestry, the FBI would never have issued the search warrant, nor would it have sought additional evidence against [the p]laintiff without first investigating the false allegations made by [the plaintiff's former employer]." Id. ¶ 33. To summarize his Fourth Amendment claim, the plaintiff asserts that "[w]hen [the FBI] raided [the p]laintiff's residence and then fraudulently applied for other search and seizure orders, [the d]efendants caused and continue to cause an unreasonable search and seizure of [the p]laintiff's person, property, papers, and effects in violation of [the p]laintiff's privacy, property, and other rights and privileges under the Fourth Amendment." Id. ¶ 153.

In their motion to dismiss, the defendants assert that "[the p]laintiff pleads no facts sufficient to state a claim for an unlawful search and seizure beyond conclusory and unsubstantiated assertions[,]" and that "[the p]laintiff's disagreement with the contents of the

sworn affidavit submitted to justify a search warrant [ ] does not state an unreasonable search and

seizure claim cognizable under the Fourth Amendment."  Defs.' Mem. at 32 (internal citation

omitted).  In response to this argument, the plaintiff alleges that "[t]he FBI [ ] recklessly

disregarded the easily verifiable truth[,]" Pl.'s Opp'n at 25, and "deliberately failed to verify the

[former employer's] 'hacking' claim to falsely elevate the validity and urgency of its search

warrant[,]" id. at 25–26.  For the reasons stated below, the Court concludes that the plaintiff has

failed to show that the search warrant was invalid and thus has not stated a cognizable claim

under the Fourth Amendment.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable

cause[.]"  U.S. Const. amend. IV.  It is well-established that "[a]n affidavit offered in support of

a search warrant enjoys a 'presumption of validity.'"  United States v. Maynard, 615

F.3d 544, 550 (D.C. Cir. 2010) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)).  The

Supreme Court has provided the following explanation for why there is an expectation of

truthfulness that attends all warrant applications:

> When the Fourth Amendment demands a factual showing sufficient to comprise
> "probable cause," the obvious assumption is that there will be a truthful showing.
> This does not mean "truthful" in the sense that every fact recited in the warrant
> affidavit is necessarily correct, for probable cause may be founded upon hearsay
> and upon information received from informants, as well as upon information
> within the affiant's own knowledge that sometimes must be garnered hastily.  But
> surely it is to be "truthful" in the sense that the information put forth is believed or
> appropriately accepted by the affiant as true.

Franks, 438 U.S. 164–65 (internal quotation marks and citation omitted).  Given this expectation,

the Fourth Amendment is violated where "a false statement knowingly and intentionally, or with

reckless disregard for the truth, was included by the affiant in the warrant affidavit, [ ] if the

allegedly false statement is necessary to the finding of probable cause."  Id. at 155–56; see also

United States v. Richardson, 861 F.2d 291, 293 (D.C. Cir. 1988) (per curiam)) (applying Franks

in upholding the validity of a search warrant supported by a false affidavit).  A movant challenging the validity of a search warrant states a cognizable Fourth Amendment claim "only if his attack on the accuracy of the affidavit is 'more than conclusory' and is . . . 'accompanied by an offer of proof.'"  United States v. Gaston, 357 F.3d 77, 80 (D.C. Cir. 2004) (quoting Franks, 488 U.S. at 171).

Here, the defendants have correctly pointed out that "[the p]laintiff pleads no facts sufficient to state a claim for an unlawful search and seizure beyond conclusory and unsubstantiated assertions" regarding the validity of the search warrant.  Defs.' Mem. at 32.  The plaintiff has utterly "failed to show that the purported false statements were . . . made with reckless disregard for the truth," United States v. Burroughs, 882 F. Supp. 2d 113, 119 (D.D.C. 2012), or made "knowingly and willfully[,]" Franks, 488 U.S. at 155.  The plaintiff has also "offered no reason to believe that [the FBI], in preparing [its] affidavit, knew" that the three statements the plaintiff identified were false, "or that [the FBI] acted in reckless disregard of the truth."  Gaston, 357 F.3d at 81.  The plaintiff offers no factual basis in either his Complaint or his opposition to support his allegations that the FBI "knowingly and willingly lied in support of the search warrant," Compl. ¶ 45; see also id. ¶¶ 46–47, and "speculation[ is] not a substantial showing" to establish a Fourth Amendment violation.  Maynard, 615 F.3d at 551.  Because there has been "absolutely no showing [that the affiant] made the statements with scienter [that the warrant was supported by false information]," Richardson, 615 F.3d at 551, the Court "need not resolve whether the [three] statements [in the search warrant affidavit] were false or material," id. at 293.  The plaintiff's factually unsupported allegations regarding the motivations of the defendants in seeking a search warrant are the exact type of "mere conclusions" that "are not entitled to the assumption of truth" under Rule 12(b)(6).  Iqbal, 556 U.S. at 664; see also Pierce

35

v. Mattis, 256 F. Supp. 3d 7, 15 (D.D.C. 2017) ("Because [the] plaintiff has not alleged sufficient facts to show that [the defendants] violated her Fourth Amendment rights, . . . [the] plaintiff has failed to state a claim upon which relief can be granted.").  Accordingly, the Court concludes that it must dismiss Count II to the extent the plaintiff alleges a Fourth Amendment violation.

**D.     The Plaintiff's Fifth Amendment Claims**

The Court now next turns to the plaintiff's claims based on the Fifth Amendment.  In this regard, the plaintiff makes two claims against specific conduct by the defendants in Counts III and IV.  See Compl. ¶¶ 156–168.  Respectively, as to both Counts, the plaintiff alleges that the defendants (1) "willfully and deliberately fabricat[ed] evidence against [the p]laintiff . . . negatively impact[ing the p]laintiff's liberty to travel, [ ] work, [ ] communicate, and [ ] carry on other ordinary activities[,]" id. ¶ 158, and that (2) "[w]ithout due process or constitutionally required legislative action, the [d]efendants . . . subjected [the p]laintiff to selective investigation and surveillance predicated on [the p]laintiff's race, ethnicity, or national origin[,]"  id. ¶ 166. The Court will address each Count in turn.

**1.     The Plaintiff's Count III Claims**

First, as to Count III, the plaintiff alleges that "[a]s a direct and proximate result of the [ d]efendants' unlawful conduct, [the p]laintiff had to resign from a federal contractor position in 2020, and [the p]laintiff's prospects of stable income have been severely and irreversibly restricted." Id. ¶ 159.  Specifically, the plaintiff believes that the defendants "knew or should have known that, since 2014, [the p]laintiff used his Google account in communications with many attorneys and citizens to organize a class action challenging a gender-discrimination law called 'Violence against Women Act[,]'" when the FBI sought to access the plaintiff's Google account.  Id. ¶ 160.  The defendants, suspecting the plaintiff has alleged a substantive due

process claim under the Fifth Amendment, see Defs.' Mem. at 34, respond that "[the p]laintiff fail[s] to identify a liberty or property interest that has been deprived[,]" id., because "[the p]laintiff pleads no factual material from which a plausible inference can be drawn that any of [the p]laintiff's liberty or property interests have been deprived at all, let alone by any acts taken by [the d]efendants[,]" id. at 35.[14]

The Fifth Amendment's Due Process Clause protects individuals from the deprivations of "life, liberty, or property, without due process of law." U.S. Const. amend. V.  For the plaintiff to allege a substantive due process violation, he must allege "arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" Zinermon v. Burch, 494 U.S. 113, 125 (1990) (quoting Daniels v. Williams, 474 U.S. 330, 331 (1986)). Wrongful government action "applie[s] to deliberate decisions by government officials t[hat] deprive a person of [his] life, liberty, or property." Roum v. Fenty, 697 F. Supp. 2d 39, 45 (D.D.C. 2010) (emphasis in original).  Specifically, under the Fifth Amendment, "[s]ubstantive due process [protections] constrain[ ] only egregious government misconduct." Decatur Liquors v. District of Columbia, 478 F.3d 360, 363 (D.C. Cir. 2007) (quoting George Washington

---

[14] The defendants also argue that "[t]o the extent [the p]laintiff asserts a procedural due process claim, he must identify the process that is due[,]" and that "[the p]laintiff failed to do so."  Defs.' Mem. at 34.  It is well understood "that no process is due if one is not deprived of 'life, liberty or property'[,]" Kerry v. Din, 578 U.S. 86, 90 (2015) (quoting Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (per curiam)) (emphasis omitted).  Thus, the Court must first determine "whether there exists a liberty or property interest of which [the plaintiff] has been deprived," Swarthout, 562 U.S. at 219, and then "[the Court] ask[s] whether the procedures followed by the [government] were constitutionally sufficient."  Id.; but see Doe by Fein v. District of Columbia, 93 F.3d 861, 870 (D.C. Cir. 1996) (internal quotations marks omitted) (alterations omitted) (recognizing that "process is not an end in itself, but is rather a means to the end of protecting substantive rights").  Here, the plaintiff fails to allege a specific "liberty or property interest[,]" Swarthout, 562 U.S. at 219, that he has been deprived of as a result of him resigning from his job, see Compl. ¶ 159, or the government seeking a search warrant on his Google account, see Compl. ¶ 160.  Thus, because the plaintiff has failed to establish depravity of a "liberty or property interest[,]" with regard to the allegations in Count III of the Complaint, the Court need not further "ask whether the procedures followed by the [government] were constitutionally sufficient[,]" Swarthout, 562 U.S. at 219, as they pertain to procedural due process under the Fifth Amendment.  Therefore, to the extent the plaintiff raises a procedural due process claim in Count III of the Complaint, the claim is dismissed.  See Doe by Fein, 93 F.3d 861, 869 (dismissing the plaintiff's claim where she failed to identify the process that was due).

University v. District of Columbia, 318 F.3d 203, 209 (D.C. Cir. 2003).  However, "a substantive

due process violation will only occur where the government's conduct is 'so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience[.]'"  Toms v. Office

of the Architect of the Capitol, 650 F. Supp.2d 11, 25 (D.D.C. 2009) (Walton, J.) (quoting Butera

v. District of Columbia, 235 F.3d 637, 651 (D.C. Cir. 2001)).  "[I]t is clear that the due process

guarantee does not entail a body of constitutional law imposing liability whenever someone

cloaked with state authority causes harm… [Rather,] conduct intended to injure in some way

unjustifiable by any government interest is the sort of official action most likely to rise to the

conscience-shocking level."  County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998).

 Here, the plaintiff fails to plead such "egregious government misconduct[,]" Decatur

Liquors, 478 F.3d at 363, that "deprive[d him] of [his] life, liberty, or property[,]" Roum, 697 F.

Supp. 2d at 45, sufficient to survive dismissal.  As the defendant points out, "[a]lthough [the

p]laintiff alleges that [the d]efendants' purported actions 'negatively impacted' his 'liberty to

travel, [ ] work, [ ] communicate, and [ ] carry on other ordinary activities," Defs.' Mem. at 35

(quoting Compl. ¶ 158), such factual allegations provide little, if any, "factual material from

which a plausible inference can be drawn[ by the Court,]" id., that shows that "[the p]laintiff's

liberty or property interests have been deprived at all, let alone by any acts taken by

[the d]efendants[,]"[15] id.; see also Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

_____

[15] The plaintiff alleges that "[a]s a direct and proximate result of the [ d]efendants' unlawful conduct, [the p]laintiff had to resign from a federal contractor position in 2020[.]"  Compl. ¶ 159.  As an initial matter, there is "substantial doubt as to whether one's interest in public employment is protected by substantive due process."  Said v. Nat'l R.R. Passenger Corp., 317 F. Supp. 3d 304, 341 (D.D.C. 2018) (Walton, J.) (quoting Winder v. Erste, 511 S. Supp. 2d 160, 183 (D.D.C. 2007)).  Even assuming arguendo that the plaintiff had a protected interest in his employment, the plaintiff fails to plead "factual content that allows the [C]ourt to draw the reasonable inference[,]" Iqbal, 556 U.S. at 678, that the defendant's conduct had any causal connection to his decision to resign from his position.  Accordingly, the Court need not reach the question of whether the plaintiff had a protected interest in his employment.

defendant is liable for the misconduct alleged.").  Moreover, the FBI "s[eeking] to access the plaintiff's [Google] account[,]" Compl. ¶ 160, in conjunction with an investigation is not "so egregious[ or] so outrageous," that it has the capacity to "shock the contemporary conscience[.]" Toms, 650 F. Supp.2d at 25.  Accordingly, to the extent the plaintiff is alleging substantive due process violations under the Fifth Amendment, such as "the-defendant-unlawfully-harmed-me accusation[s,]" Iqbal, 556 U.S. at 678, his claims made in Count III are dismissed.

## 2.    The Plaintiff's Count IV Claims

In Count IV, the plaintiff alleges that the defendants' "ongoing practice to entice, encourage, or compel private sector employers to surveille and inform about persons of Chinese ancestry requires a vigorous legislative debate on admissibility of evidence and liabilities of private employers[,]" Compl. ¶ 167, and that the defendants "have willfully and deliberately disregarded the domestic limits placed by the equal protection clauses."  Id. ¶ 168.  The defendants respond that because the plaintiff "merely alleges that he, like other 'persons of Chinese ancestry,' has been subjected to repeated investigations and harassment 'without probable cause[,]'" Defs.' Mem. at 36, that "[the p]laintiff fails to identify any similarly situated person who allegedly received more favorable treatment than he received[,]" id., and that "[the p]laintiff identifies no comparators who bear even a slight resemblance to him[,]" id., he "fails to state an equal protection claim [under the Fifth Amendment]."[16]  Id.

---

[16] The plaintiff also makes equal protection claims under Count IV pursuant to the Fourteenth Amendment, see Compl. ¶ 168, despite having filed this suit against defendants associated with the federal government. San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm., 483 U.S. 522, 542 n. 21 (1987) ("[T]he Fourteenth Amendment does not apply [to the federal government]"); see also Miango v. Democratic Republic of the Congo, 243 F. Supp. 3d 113, 128 n.7 (D.D.C. 2017) (same).  Accordingly, the plaintiff's claims based on the Fourteenth Amendment must be dismissed.  See Lyles v. Hughes, 83 F. Supp.3d 315, 324 n. 1 (D.D.C. 2015) (dismissing the plaintiff's Fourteenth Amendment claims against the federal government defendants).

The Due Process Clause of the Fifth Amendment "contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." Acosta v. University of District of Columbia, 528 F. Supp. 1215, 1224-25 (D.D.C. 1981) (quoting Washington v. Davis, 426 U.S. 229, 239 (1976)). The clause requires that "similarly situated persons must be treated alike[,]" Frederick Douglass Found., Inc. v. District of Columbia, 531 F. Supp. 3d 316, 339 (D.D.C. 2021), and where there is "[d]issimilar treatment of dissimilarly situated persons," id. (quoting Women Prisoners of D.C. Dep't of Corr. v. District of Columbia, 93 F.3d 910, 924 (D.C. Cir. 1996)), such conduct "does not violate equal protection[,]" id. (citation omitted). Thus, "[t]he threshold inquiry in evaluating an equal protection claim is . . . to determine whether a person is similarly situated to those persons who allegedly received favorable treatment." Id.; see also BEG Investments, LLC v. Alberti, 85 F. Supp. 3d 13, 35 (D.D.C. 2015) (Rejecting as conclusory the plaintiffs' assertion that they were treated differently from those "similarly situated" where the complaint failed to offer examples of how others were "similarly situated").

Here, the plaintiff fails to allege any indicia of "[d]issimilar treatment of [a ]similarly situated person[ ]," Fredrick Douglass Found., Inc., 531 F. Supp. 3d at 339, to himself sufficient to survive dismissal. The plaintiff admits he wrongfully "used [his work] computer for personal matters with the separate operating system he had installed on the new laptop and was ready to accept applicable consequences, including termination." Compl. ¶ 37. Because of his misconduct, the plaintiff clearly understood that "applicable consequences," id., by his former employer were forthcoming, which does not suggest that "a person [ ] similarly situated[,]" Fredrick Douglass Found., Inc., 531 F. Supp. 3d at 339, would not expect similar consequences for similar conduct, especially in light of the fact that the plaintiff willingly resigned his position,

Compl. ¶ 159.  Furthermore, although the plaintiff alleges "dissimilar treatment[,]" <u>Fredrick</u>

<u>Douglass Found., Inc.,</u> 531 F. Supp. 3d at 339, by his employer, he provides no support for how

his former employer's response to his admitted misconduct was "entice[d], encourage[d], or

compel[led,]" Compl. ¶ 167, by the defendants.  Nor does the plaintiff provide any support for

his position that the defendants "subjected [him] to selective investigation and surveillance

predicated on [his] race, ethnicity, or national origin. <u>Id.</u> ¶ 166.Thus, "[t]he threshold inquiry in

evaluating [the plaintiff's] equal protection claim[,]" <u>Fredrick Douglass Found., Inc.,</u> 531 F.

Supp. 3d at 339, is not satisfied because the plaintiff has again failed to "plead[ ] factual content

that allows the [C]ourt to draw [a] reasonable inference that the defendant[s are] liable for the

misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678.  Accordingly, to the extent the plaintiff makes an

equal protection claim under the Fifth Amendment in Count IV, this claim is also dismissed.  <u>See</u>

Fed. R. Civ. P. 12(b)(6).

**E.      The Plaintiff's Requested Relief for the Return of His Property Seized by the FBI**

Finally, the Court will address the last outstanding issue—whether this Court is the

"appropriate venue for [the p]laintiff to seek return of his property" seized by the FBI.  Defs.'

Mem. at 14.  In his Complaint, the plaintiff requests that this Court "order[ the d]efendants to

release [p]laintiff's personal properties[.]"  Compl. at 37.  The defendants argue in their motion

to dismiss that this Court "is not the appropriate venue for [p]laintiff to seek return of his

property" under Federal Rule of Criminal Procedure 41(g).  Defs.' Mem. at 14.  The defendants

ask this Court to "dismiss for improper venue any [ ] claims [seeking return of the plaintiff's

property] or, alternatively, transfer those claims to the District Court for the District of

Delaware."  <u>Id.</u>  In response, the plaintiff requests that this Court postpone ruling on the

defendants' motion for dismissal for improper venue because the seized property is "not essential

for seeking declaratory judgment and other injunctive relief."  Pl.'s Opp'n at 13.

28 U.S.C. § 1391(b) provides that a civil action may be brought in

(1) a judicial district in which any defendant resides, if all defendants are residents
of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving
rise to the claim occurred, or a substantial part of property that is the subject of
the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided
in this section, any judicial district in which any defendant is subject to the court's
personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

The Court may either dismiss a case, "or if it be in the interest of justice, transfer such

case to any district . . . in which it could have been brought."  28 U.S.C. § 1406(a).  "The

decision whether a transfer or a dismissal is in the interest of justice[ ] rests within the sound

discretion of the district court" where the suit was improperly filed, see Naartex Consulting

Corp. v. Watt, 722 F.2d 779, 789 (D.C. Cir. 1983).  This Circuit does favor transfer when

"procedural obstacles—such as lack of personal jurisdiction[ or] improper venue . . . impede an

expeditious and orderly adjudication [ ] on the merits."  Coltrane v. Lappin, 885 F. Supp.

2d 228, 235 (D.D.C. 2012) (Walton, J.) (internal quotation marks omitted).  When the issue of

whether to transfer or dismiss arises where the plaintiff is pro se, there is a "presumption in favor

of transfer[ing]" a complaint that "dovetails with the normal application of liberal standards to

pro se pleadings[,]" Sanchez-Mercedes v. Bureau of Prisons, 453 F. Supp. 3d 404, 418 (D.D.C.

2020).  However, there are no "fixed general rules on when cases should be transferred[.]"

Starnes v. McGuire, 512 F.2d 918, 929 (D.C. Cir. 1974).  Indeed, "transfer is not always

appropriate in pro se cases[,]" Sanchez-Mercedes, 453 F. Supp. 3d at 418, especially if there are

"substantive problems with [the plaintiff's] claims[,]" Buchanan v. Manley, 145 F.3d 386, 389

n.6 (D.C. Cir. 1998), that outweigh transferring in the "interest of justice[,]" 28 U.S.C. § 1406(a).

Here, the plaintiff has made no allegation that any "part of the events . . . giving rise to

[his] claim," 28 U.S.C. § 1391(b)(2), for the return of his seized property occurred in the District

of Columbia, see generally Compl.  In fact, in his Complaint, the plaintiff acknowledges that

"[o]n November 27, 2019, the FBI conducted a predawn raid of [his] residence," Compl. ¶ 33,

which was in Delaware, see id. ¶ 34.  Furthermore, the plaintiff identified as his address a

location in Hockessin, Delaware to the Court with his filings, see id. at 38; Pl.'s Opp'n at 1, 33.

Therefore, it is undisputed that the warrant was executed in Delaware, and the plaintiff makes no

objection to the defendants' assertion that the "search warrant was executed at [the plaintiff's]

residence located in Delaware."  Defs.' Mem. at 14.  Accordingly, without any evidence that the

District of Columbia is the "judicial district in which a substantial part of the events or omissions

giving rise to the claim occurred," 28 U.S.C. § 1391(b)(2), the Court concludes that the District

of Columbia is not the appropriate venue for the plaintiff to pursue the return of his property.

See Ford-Bey v. United States, No. 19-cv-2039 (BAH), 2020 WL 32991, at *11 (D.D.C. Jan. 2,

2020) ("The venue for civil actions seeking equitable relief in the form of the return of seized

property is determined by resort to the standard venue statute, 28 U.S.C. § 1391.").

Even though the Court has concluded that this Court is not a proper venue for the

plaintiff's Fourth Amendment claim challenging the validity of the search warrant executed at

his home, the Court nonetheless concludes that it is not "in the interest of justice[,]" 28 U.S.C.

§ 1406(a), to transfer this case to the plaintiff's home forum because the Complaint suffers from

several "substantive problems[,]" Buchanan, 145 F.3d at 389 n.6.  The Court has already

dismissed all of the plaintiff's other claims for the reasons stated, supra, and therefore all that

remains are the issues regarding the "release [of the p]laintiff's personal properties and t[he] expunge[ment of] any and all of his FBI records."  Compl. at 37.  And, while the plaintiff might have a cognizable claim at some point for the return of his property and the expungement of his FBI records, as the defendants point out, the plaintiff alleges in his Complaint that "to the present day" he has received "messages from a hacker group" that he believes are "likely phishing attacks from the FBI[ ] or its intelligence assets[,]" id. ¶ 52.  Accordingly, as opined by the defendants, these allegations by the plaintiff do not suggest that "criminal proceedings against [the p]laintiff are over."  Defs.' Mem. at 13.  Therefore, not only has the plaintiff requested return of his property and the expungement of his FBI records in the wrong venue, see 28 U.S.C. § 1391(b)(2), but his request appears premature as well, see United States v. Farrell, 606 F.2d 1341, 1347 (D.C. Cir. 1979) ("[C]ourts may rightfully refuse to return claimed property when . . . the property involved is subject to government retention pending termination of the trial"); see also United States v. Price, 914 F.2d 1507, 1511 (D.C. Cir. 1990) (per curiam) ("[T]he District Court has both the jurisdiction and the duty to ensure the return of the defendant's property[,] but only when no government claim lies against that property"); see also Ford-Bey, 2020 WL 32991, at *7 (same).  Accordingly, because the plaintiff's property was not seized in the District of Columbia and matters related to the property may not have come to an end, the Court dismisses without prejudice the plaintiff's Fourth Amendment claims as they pertain to the seizure of his personal property.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendants' motion to dismiss and dismiss the plaintiff's Complaint.

**SO ORDERED** this 15th day of December, 2023.[17]

REGGIE B. WALTON
United States District Judge

---

[17] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.